NATHANIEL J. HESS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33279.   Promulgated October 26, 1931.

*Lawrence A. Tanzer, Esq.*, and *James C. Peacock, Esq.*, for the petitioner.

*M. E. McDowell, Esq.*, for the respondent.

OPINION.

MATTHEWS: In order to determine the gain resulting to the petitioner in 1922 from the sale of his 6¼ shares in the 432 Fourth Avenue Corporation in that year we must first ascertain the cost of those shares, which were acquired by petitioner in November, 1913.

The cost of the Fourth Avenue Corporation shares would ordinarily be determined by the market value of the shares of the Realty Holding Company at the time of exchange, but no evidence was presented as to such market value. It is not likely in the circumstances that the stock of this company had any market value, as it was held closely by the Hess brothers, and as the respondent suggests in his brief, the company itself was probably intended simply as a conduit of title which by its corporate form would protect the petitioner and his brother from any liability resulting from the hazards of building, injuries to workmen, etc., which they as individuals, with unlimited liability, might otherwise incur. The very nature of the holding company and the close holding of its stock precludes the supposition that its stock had a readily realizable market value, ascertainable by market sales or quotations. It becomes necessary to inquire whether the intrinsic value of the assets back of the stock may be easily ascertained. *George M. Wright*, 19 B. T. A. 541, 548. If so, we may take the 1913 market value of the assets transferred by the holding company to the Fourth Avenue Corporation as the measure of the cost of the stock of the latter company received by the petitioner at that time. Indeed, while these assets were nominally transferred by the Holding Company to the new corporation, they were in substance transferred by the petitioner and his brother, Edwin H. Hess, since they were the real parties in interest in the Holding Company. The value of the assets, then, less any charges or other indebtedness attaching to them, actually represents the cost of Fourth Avenue Corporation stock received in 1913 in exchange.

The evidence of the value of the land and building at the northwest corner of Fourth Avenue and Twenty-ninth Street, New York City, which constituted those assets, is clear and convincing. We have found it to be $1,100,000. The lot itself was desirable by reason of its location on the northwest corner and its substantial frontage on Fourth Avenue, which, at the time it was acquired by the new corporation, was becoming an important business street. The development of Fourth Avenue began after the building of the subway about 1906 or 1907 and was well advanced by 1912. The petitioner, who had had long experience in New York real estate, testified that it was worth between $1,100,000 and $1,250,000. One wit-

ness, Peter Grimm, who had been president of the Building Managers' Association, an organization which represented some $3,000,-000,000 assessed value in New York buildings and to which most large real estate office and large building managers belong, and who was at the time of the hearing president of the real estate board of New York, testified upon the value of the property in 1913. He stated, "I gave to the land a minimum of $450,000 and to the building a minimum of $640,000, making a total of $1,090,000, and I could with equal conscience give the land $490,000 and the building $640,000." He explained that the variation in the estimate on land value was the maximum he would pay for the lot and the minimum he would sell it for, and that "anything between those figures would be a proper valuation in my judgment." At another time during his examination he stated that the combined value of building and land was "probably as much as $1,145,000." He was inclined to think the price of $465,000, or $54 a square foot for 8,600 square feet, which he had been told the petitioner paid, somewhat high, but the sale prices of the Passavant and Ogden Mills properties, nearby on Fourth Avenue but less valuable by reason of less frontage on the avenue and other factors, justified him, he testified, in placing a value of $52 per square foot on petitioner's land. We believe that the testimony of so well qualified a witness speaks for itself. The expert knowledge and independent character of this witness stamp his opinion with full credibility. The witness's estimate of the value of the building, $640,000, was based on normal reconstruction value of the building, about 31 or 32 cents a cubic foot, the building containing 1,992,000 cubic feet of space. Such a method of estimating cost has received this Board's approval. *Chamber of Commerce Building Co.*, 11 B. T. A. 720, 722.

Moreover, the taking of a mortgage on the property by the Metropolitan Life Insurance Company in the amount of $725,000 further substantiates our finding, for the practice of that company under the State law is to take mortgages for no more than 50 per cent of value; McKinney's Consolidated Laws of New York, Ann., Book 27, section 100, Insurance Law, 1892, as amended 1906 and subsequently.

As was said by the Supreme Court, per Brewer, in *Montana Ry. Co.* v. *Warren*, 137 U. S. 348: "At best, evidence of value is largely a matter of opinion, especially as to real estate."

The respondent has introduced no evidence to rebut the expert testimony supporting the petitioner's contention as to value, and we adopt it therefore as the value of the assets in November, 1913, which underlay the shares of the 432 Fourth Avenue Corporation. *Anita M. Baldwin*, 10 B. T. A. 1198.

It follows that the total cost of that company's stock when received by the petitioner in exchange for the assets of building and lot transferred to the corporation by petitioner and his brother (nominally by the Holding Company) was the 1913 value of that lot and building, which we have found to be $1,100,000, less the charges upon those assets, or the sum of the insurance company's mortgage, $725,000, plus the certificates of indebtedness, $251,108.56, which represented additional advances for building made by petitioner and his associates. The resulting difference, therefore, of $123,891.44, constitutes the cost of the company's stock. The cost of the petitioner's 6¼ shares (one-eighth of the total shares issued) sold in 1922 was one-eighth of this amount, and the resulting gain to him will be measured accordingly.

2. With respect to the second issue, we have been unable to find any facts to support the petitioner's contention that he spent in 1922, for the entertainment of his customers, $4,160 which might be deducted under section 214(a)(1) as ordinary and necessary expenses incurred in carrying on his business. Checks and club and restaurant bills totaling $4,147.97 were put in evidence by the petitioner, but the petitioner's own testimony on the stand leaves not only the amount but the purposes of these expenses in considerable doubt.

Petitioner was president of M. & L. Hess, Inc., and entertained on behalf of the corporation, but these expenses were never allowed as expenses of the corporation and they were never entered on its books. The petitioner kept no books of account or record himself respecting them, but sought at the hearing to establish the minimum amount of such expenses by trying to identify canceled bank checks, restaurant and club bills, receipts, etc. Petitioner confessed his inability to identify with any certainty checks drawn to cash and used in entertainment for business purposes, and he showed a like uncertainty as to club bills. Obviously on this state of the evidence it is impossible to say how much these expenses amounted to. On the authority of *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, 544, we should, however, have to hazard a guess as to the amount allowable if another factor did not here intervene. The petitioner has not proved that these expenses were necessary. The entertainment, as said, was of customers of the corporation and if necessary in the business of the corporation was properly an expense of the corporation. But petitioner's brother and his other associates in the corporation stoutly refused to allow the corporation to reimburse him for these expenses. Having failed to obtain reimbursement from the corporation, the petitioner now seeks to claim

480

them as necessary business expenses incurred by himself as an individual. We do not think them allowable and on this issue hold for the respondent.

The facts stipulated on the third issue raised allow it to be disposed of by us under Rule 50, and judgment will accordingly be entered thereunder.

*Judgment will be entered under Rule 50.*