Estate of Samuel B. Walton, Deceased, Laura K. Walton, Executrix, and Laura K. Walton v. Commissioner.
Estate of Walton v. Commissioner
Docket No. 64674.
United States Tax Court
T.C. Memo 1962-63; 1962 Tax Ct. Memo LEXIS 243; 21 T.C.M. (CCH) 346; T.C.M. (RIA) 62063; March 23, 1962
*243 Laura K. Walton received 150 acres of farmland located on the outskirts of Lexington, Kentucky, an undivided one-half interest passing to her by deed from her grandparents prior to March 1, 1913, subject to a life estate in her mother, the remaining undivided one-half interest passing to her by deed from her sister on February 8, 1943, after an agreement settling the mother's estate. Laura K. Walton had the land subdivided and developed, her husband and son acting for her. Independent real estate agents sold the property by lots. Held, the property was not held for sale to customers in the ordinary course of a trade or business by Laura K. Walton, and petitioners are taxable on the net proceeds as capital gains. Held further, petitioners' basis for the property is $68,750. William B. Gess, Esq., Citizens Union Bank Bldg., Lexington, Ky., Jack F. Mattingly, Esq., and Edward A. Dodd, Esq., for the petitioners. S. Earl Heilman, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income taxes and additions to taxes for the calendar years and in the amounts which follow: Additions to Tax,
I.R.C. 1939
Sec.
Sec.
Taxpayer
Year
Deficiency
294(d)(1)(A)
294(d)(2)
Est. of Samuel B. Walton, Decd., and
Laura K. Walton
1950
$ 5,375.88
1951
2,185.90
$ 283.52
$ 170.12
Laura K. Walton
1952
13,632.81
2,414.76
1,448.87
1953
28,236.60
Respondent *244 has conceded on brief that petitioners are not liable for the additions to tax provided by sections 294(d)(1)(A) and 294(d)(2), Internal Revenue Code of 1939, for the years 1951 and 1952, and has conceded further that petitioners are entitled to a medical expense deduction for the taxable year 1951 which previously had been in issue. Two issues remain for our consideration: (1) Was the property known as Elkhorn Parks Subdivision, portions of which were sold in the years 1950 to 1953, inclusive, held by Laura K. Walton primarily for sale to customers in the ordinary course of her trade or business in those years; (2) what was the fair market value of Laura K. Walton's undivided one-half interest in the property as of March 1, 1913, and of the remaining undivided one-half interest as of February 8, 1943. Findings of Fact Certain facts have been stipulated and are so found. The petitioners are the Estate of Samuel B. Walton, Deceased, Laura K. Walton, Executrix, and Laura K. Walton. Samuel B. Walton died on March 27, 1951. Joint Federal income tax returns were filed by Laura and Samuel for 1950 and by Laura and the Estate of Samuel for the year 1951. Individual returns were filed by Laura *245 for the years 1952 and 1953. All the returns were filed with the collector or the director of internal revenue at Louisville, Kentucky. One petition was filed contesting two statutory notices, one issued to the Estate of Samuel B. Walton, Deceased, Laura K. Walton, Executrix, and Laura K. Walton, Surviving Wife, for the years 1950 and 1951, and one to Laura K. Walton for the years 1952 and 1953, respectively. Since Laura K. Walton was the owner of the property involved, she will be referred to as the petitioner. In 1892 the petitioner's grandparents conveyed a 150-acre farm, located about one and one-half miles from the city of Lexington, Kentucky, to a trustee, in trust for petitioner's mother for life, with a remainder to Laura and her sister, Robert Rodes Kinkead. Upon the death of their mother in 1942, the property vested in possession in petitioner and her sister. By her last will and testament petitioner's mother bequeathed and devised the bulk of her estate to Robert Rodes Kinkead. The values of the gross estate and the net distributable estate were about $165,215.94 and $115,000, respectively. Robert Rodes Kinkead received about $108,000 thereof, petitioner about $6,000, *246 and third-party beneficiaries about $1,000. Petitioner, Laura K. Walton, threatened to institute legal proceedings contesting the validity of her mother's will. Had she filed such an action and been successful therein, the net estate of Laura S. Kinkead would have passed to and vested in her heirs at law in accordance with the laws of descent and distribution of the Commonwealth of Kentucky. Petitioner and her sister were the sole heirs at law of their mother. The controversy was settled by an agreement of the sisters on February 8, 1943. It was agreed that Laura would not contest the will, and she released rights to certain property owned by her mother and conveyed it to her sister; arrangements were made to pay funeral expenses, inheritance and estate taxes from the sale of certain property; Laura was released from liability on a note she had given to her mother; and petitioner's sister released all right, title, and interest in the farm, the remainder in which had been conveyed to Laura and her sister by their grandparents, and conveyed such right, title, and interest to petitioner. This 150-acre tract of land subsequently was designated Elkhorn Parks Subdivision. The documentary *247 stamps attached to the deed were in the amount of $16.50. In 1939 the Kentucky Department of Highways constructed two roads through the farm - Cane Run Road and Northern Parkway Extended - and thereby divided the farm into three separate tracts of land. The bulk of what had been the original 150-acre tract then lay in one tract, between Cane Run Road and Northern Parkway Extended; one small tract lay west of Cane Run Road and another small tract lay southeast of Northern Parkway Extended. For approximately 50 years the original tract had been farmed by tenants, and in 1943 it was in a "run down" condition for farming purposes. In that year the land was swampy and shallow, it was overrun with weeds, the buildings were in poor condition and barely usable, and the fences were in poor condition. Between 1942 and 1946 Samuel B. Walton endeavored to sell the property as a whole and procured the services of realtors for this purpose but to no avail. In a further effort to sell the property, Samuel, acting for and on behalf of the petitioner, engaged the services of an architect in 1942 to prepare a plat of partition and subdivision of the property. This plat, approved in December 1943 and *248 recorded in the Fayette County Court Clerk's Office, Lexington, Kentucky, on February 3, 1944, was superseded by a plat prepared by an engineer on May 28, 1946, approved by the Lexington-Fayette County Planning and Zoning Commission and recorded on May 31, 1947, in the County Clerk's Office. The plat of the property depicting access roads and utilities was prepared and filed to comply with the requirements of the Commission for the sale of tracts or parcels from a large tract of land. The Commission required the owner to post a bond to guarantee that the improvements shown on the plat would be completed. The efforts to sell the property as a whole proved unsuccessful, and Samuel, at the suggestion of a Lexington realtor, offered the property for sale in lots and tracts at public auction on September 22, 1948. Ten lots were sold at the auction for the aggregate gross sum of $10,960. The cost of the lots totalled $15,971.46. A loss of $5,011.46 was sustained from the sale. The petitioner and her husband, on November 25, 1944, borrowed $25,000 from Southern Trust Company, of Louisville, Kentucky, secured by a mortgage on the Elkhorn Parks property. Proceeds of the loan were paid to Mutual *249 Benefit Life Insurance Company in the amount of $15,000 to satisfy an existing mortgage indebtedness on the property, and the balance of $10,000 was deposited to an amount of petitioner and her husband for development of the property. Additional deposits of $1,310 were made to this account from September 6, 1945, to April 16, 1946. From February 7, 1946, to March 22, 1947, $9,607.29 was disbursed therefrom for surveying, grading, staking lots, drainage, removing an old fence, and other arrangements. On April 1, 1947, petitioner and her husband borrowed $70,000 from Security Trust Company, of Lexington, secured by a mortgage on the Elkhorn Parks property. The "Mortgage Deed of Trust" provided for the release of lots from the mortgage upon sale thereof at specified minimum prices and payment to the mortgagee of specified amounts. The instrument also appointed petitioner's husband, Samuel B. Walton, and her son, Samuel B. Walton, Jr., as lawful agents and attorneys-in-fact, vesting each, severally, with full power to act for her in connection with the mortgage deed of trust. The proceeds of this loan were disbursed to Southern Trust Company in the amount of $23,651.89, in full satisfaction *250 of its mortgage indebtedness, and the balance of $46,348.11 was deposited to the account of Elkhorn Parks Subdivision in the Second National Bank. As lots were sold, the indebtedness due Security Trust Company was paid from 1948 to 1953, inclusive, as follows: During year 1948
$ 8,000
During year 1949
5,000
During year 1950
15,000
During year 1951
6,000
During year 1952
9,000
During year 1953
27,000
Total
$70,000 Neither Samuel, Samuel, Jr., nor Laura advertised Elkhorn Parks Subdivision for sale in whole or in part, subsequent to 1950. In 1946 Samuel had a sign erected on the premises. During the years 1946 to 1950, inclusive, he paid rental for the sign and inserted advertisements in the local newspaper, expending therefor the following amounts: Lexington
Year
Sign
Herald-Leader
Total
1946
$356.49
$921.54
$1,278.03
1947
80.00
95.35
175.35
1948
70.00
11.55
81.55
1949
$160.00
$ 160.00
1950
100.00
100.00
Total
$1,794.93
The sign placed on the property by Samuel on behalf of petitioner stated "Elkhorn Parks, Samuel B. Walton, Agent" and included his office telephone number. After 1950 the sign was in bad repair. Samuel had stationery that included the name "Elkhorn Parks" and gummed tape with "Elkhorn Parks" printed thereon. *251 During the years 1947 through 1953 various improvements were made in the subdivision by or on behalf of Laura, consisting of the following categories and at the costs listed: Roads
$41,828.35
Grading and draining
20,787.85
Utilities deposits
52,712.66
Engineering
4,453.00
Miscellaneous
234.13
Total
$120,015.99 The sum of $52,712.66 was deposited with the water, gas, and electric utility companies for the initial cost of installation of water, gas, and electric lines. The utility companies refund portions of these installation costs as property owners in the subdivision connect to the utility lines. As of December 31, 1953, the water, gas, and electric utility companies had refunded the sum of $7,189.01. The petitioner has continued to receive additional refunds from the utility companies since December 31, 1953. The three separate tracts of the farm, as created by the construction of Cane Run Road and Northern Parkway Extended by the Kentucky Department of Highways in 1939 were platted and divided into a total of 213 proposed residential and apartment lots, two business areas, and four "park" sections. The following number of sales transactions were consummated: No. of
No.
Trans-
of Lots
Gross
Year
actions * *252 or Areas
Proceeds
1948
8
18
$23,448.00
1949
0
0
0
1950
5
11 lots
30,315.20
1 tract
1951
2
3
5,900.00
1952
9
9 lots
39,500.00
2 tips
2 tracts
1953
12
32 lots
99,745.00
3 tracts At the end of 1953 about 140 lots remained unsold; 50 to 60 lots remained unsold in 1959. Books for the subdivision were maintained by an accountant. The petitioner was not interested in business and devoted no time to the subdividing, goning, improvement or sale of the property known as the Elkhorn Parks Sudivision. She had nothing to do with sales of the property involved except to sign deeds, contracts, mortgages, and such other papers as her son or husband told her to sign. Prior to his death in 1951 Samuel represented Laura in connection with the sales of the property, including the hiring of an architect to draw a plan of subdivision; arranging for the subdivision, including the decision to spend the money therefor; arranging for improvements such as roads, grading, and draining; arranging for engineering work; borrowing money and negotiating loans; maintaining bank accounts and expending money; arranging for such advertising as was used; employing real estate agents; arranging for restrictions in deeds to the property; approving plans for homes that had been purchased; and all other necessary work. He devoted *253 less than 10 percent of his time to that work. His principal business was insurance. After the death of petitioner's husband, her son, Samuel B. Walton, Jr., took care of the petitioner's interests in the subdivision. He dealt with real estate agents; arranged financing; assisted real estate agents in attempting to sell the property; approved plans for residences; borrowed money; and arranged for necessary improvements. In the taxable years he made no sales, and referred all customers to the real estate agents. He had some difficulty in getting real estate agents to handle the property. Samuel, Jr.'s, chief business was insurance, but he spent approximately five percent of his time in connection with the subdivision. The articles of co-partnership of the insurance business of Samuel, Jr., and his partner recognized Samuel's obligation to look after his mother's affairs. The petitioner's husband sold one or two lots individually, but most of the lots were sold by real estate agents. The deeds of sale to the lots contained certain restrictions designed to make the lots saleable. They included the requirement that the plans be approved by Samuel or Samuel, Jr. Such restrictions were enforced *254 by petitioner's husband or son on her behalf. The contracts with the real estate brokers provided that they advertise the property. Proceeds from the sale of lots, totalling at least $198,908.20 by the end of 1953, were used to retire borrowed indebtedness and for grading and other improvements, including the construction of a street. Improvements to roads were effected under an obligation represented by a personal bond posted by petitioner. Since 1953, $10,000 or $12,000 has been borrowed on an open note. In 1959 there was still a sewage disposal problem. The bulk of the unsold lots does not meet soil conditions necessary for use of septic tanks required by the health department. Construction of the necessary sewer system would be an expensive undertaking. In 1950 the profits from the sale of subdivision property were not reported, either as ordinary income or capital gains. In 1951 a loss from subdivision property transactions was reported as an ordinary loss. In 1952 and 1953 profits from the sale of subdivision property were shown as longterm capital gains. Lexington grew in population, and there was a demand for homes in the Lexington area from 1946 to 1953. The adjusted gross *255 income for the taxable years, other than income from land sales, was as follows: Year
Income
1950
$27,371.90
1951
18,692.93
1952
17,957.91
1953
11,704.28
The property owned by Laura K. Walton in Elkhorn Parks Subdivision was not held by her primarily for sale to customers in any trade or business of hers. Laura's basis in the property is $68,750. Opinion The principal issue is whether proceeds of the sale of certain real property should be taxed as ordinary income or as capital gains. Laura Walton's mother died in 1942, at which time 150 acres of land located one and one-half miles from Lexington, Kentucky, vested in possession in Laura and her sister, each of whom had an undivided one-half interest in the property. The petitioner acquired title to the entire property in 1943 through an agreement with her sister which settled their mother's estate. In the taxable years 1950 to 1953, inclusive, 63 parcels of the property were sold in 28 transactions. The respondent determined that these sales were made by the petitioner in the ordinary course of her trade or business and that the proceeds are taxable as ordinary income. The petitioner contends that she was liquidating a capital asset and is entitled *256 to have the profits taxed as capital gains. The issue is governed by section 117(a), Internal Revenue Code of 1939. [1]
The property was originally platted in 1942. That plat was revised in 1946. The land was mortgaged at least three times prior to 1948 and portions of the proceeds of the loans were used for development of the tract. In all, petitioner expended $120,000 for improvements to the property and by the end of 1953 had realized almost $200,000 from sales of parcels thereof. During some six years the petitioner tried unsuccessfully to sell the tract as a whole. In 1948 an auction of lots was held, and a few were sold. Using the cost basis claimed by petitioner, these auction sales resulted in a net loss. In 1949 no sales were made. In the taxable years lots were sold at a gain. Inherited real property, as such, is a capital asset. If it is sold as a unit, *257 any gains realized by the heirs are generally regarded as capital gains. If it becomes necessary to sell in parts in order to realize a better price, that fact alone does not convert the parts into property held for sale to customers in a business of the heirs. Smith v. Dunn, 224 F. 2d 353 (C.A. 5, 1955); Camp v. Murray, 226 F. 2d 931 (C.A. 4, 1955); Allen Moore, 30 T.C. 1306 (1958). The heirs may engage an agent to develop and sell the property piecemeal, and although the agent is engaged in business, the heirs are not necessarily in business and holding the property for sale to their customers by virtue of the acts of the agent. Estate of William D. Mundy, 36 T.C. 703 (1961); Smith v. Dunn, supra. The problem of whether real estate is held primarily for sale to customers in the ordinary course of business has been considered by the Courts on numerous occasions. Criteria have been mentioned in the various opinions which may have weight in resolving the issue in a particular case. Among these have been the purpose or reason for the acquisition of the property; the number, frequency and volume of sales; the extent to which the owner or his agent engaged in sales activities, by *258 developing, improving, and advertising the property; and whether the taxpayer continued to purchase more properties during the period as part of a basic plan of buying and selling real estate. Standards which may be significant in some settings, however, are of little aid in others. No single factor is necessarily controlling and each case turns upon its own facts. The issue here depends upon the intention of Laura at the time of selling, whether it was to liquidate the property or to engage in the real estate business, using her land as stock held for sale. Laura originally planned to liquidate. If she changed her intention there must be evidence to show such a change. Her intent is to be deduced from all the facts and circumstances. In cases where it has been held that heirs were holding real property for sale to customers in the ordinary course of their trade or business, the evidence was regarded as showing that the heirs had changed their intention from that of liquidation to that of engaging in the real estate business for profit. Brown v. Commissioner, 143 F. 2d 468 (C.A. 5, 1944), affirming a Memorandum Opinion of this Court; Ehrman v. Commissioner, 120 F.2d 607 (C.A. 9, *259 1941), affirming 41 B.T.A. 652 (1940), certiorari denied 314 U.S. 668 (1941). The respondent contends that sale of 63 lots in the four taxable years out of 213 lots platted shows a frequency and continuity of sales over a long period of years; that the petitioner's husband and son, as her agents, exerted much effort in subdividing, improving, financing, and selling lots and approving construction plans; that the transactions were substantial in amount; and that huge sums were spent upon development of the property. The respondent's argument is that the petitioner changed her intention from that of liquidation to that of engaging in the real estate business. The fact that a liquidation of a capital asset consisting of real property may involve a number of sales of small parcels over a considerable period of time is not conclusive that the owners have changed their intent to that of engaging in business. In Chandler v. United States, 226 F. 2d 403 (C.A. 7, 1955), a corporation was liquidating from 1915 to 1950 its holdings of over a million acres of land and sold over 290,000 acres in the period from 1942 to 1950 in 536 transactions. This was held to warrant capital gains treatment. *260 In Garrett v. United States, 120 F. Supp. 193 (Ct. Cl. 1954), the taxpayers inherited certain beach property, previously divided into lots, and sought to liquidate the property. One of the heirs devoted most of his time to the property and the estate, maintained an office, placed signs on the property, and received fees as executor and commissions on the sale of lots for the benefit of the heirs, proceeds being deposited to the credit of the estate. The liquidation continued from 1925 to 1946. This was held to be a liquidating operation and the proceeds taxable as capital gains. In these cases the intent of the owners to liquidate was deemed established by the evidence. The fact that sales were frequent and continuous is not conclusive that the owners were in a business. Fahs v. Crawford, 161 F. d 315 (C.A. 5, 1947); Delsing v. United States, 186 F. 2d 59 (C.A. 5, 1951). It is apparent in the present case that the petitioner had no purpose other than an orderly liquidation of the inherited farm land. Because of new roads and of swampy conditions, it was no longer suitable for farming. She had been unable to sell it as a whole or in large parcels. The growth of the city of Lexington *261 made this land suitable for potential home sites, and the sale by lots suitable for residence purposes seemed the only practicable way of disposof the land. The petitioner was a housewife and without business experience. Her husband was primarily engaged in the insurance business, as was also her son. They gave only a small part of their time to arranging with surveyors or contractors or real estate agents looking to the subdividing, developing, and sale of her land. Advertising was not extensive; sales were occasional, rather than continuous; development was carried out by contractors; and sales were negotiated by independent agents. Upon an appraisal of all the facts, we conclude that the property was not held by the petitioner for sale to customers in any business of hers. The second issue for our consideration is the proper basis of the property sold. The parties agree that an undivided one-half interest in the land should be valued at the fair market value as of March 1, 1913, and that the other undivided one-half interest should be valued at the fair market value as of February 8, 1943. Respondent determined that the value of the land was $125 per acre as of March 1, 1913, and *262 $250 per acre as of February 8, 1943, and therefore had a total basis of $28,125. Petitioner contends that the value of the land was $250 per acre as of the earlier date and $750 per acre as of the latter, and thus had a total basis of $75,000. The expert testimony of a Kentucky Department of Revenue field supervisor was offered by respondent in support of the 1943 valuation. Testimony of two local real estate agents was offered by petitioner in support of the values she claims for 1913 and 1943. Respondent's witness conceded under cross-examination that he made a determination of the value of the property at $200 per acre as of February 8, 1943, on the basis of the tax stamps attached to the deed of conveyance from petitioner's sister to petitioner. It was not demonstrated, however, that the stamps attached thereto were based on the fair market value of an undivided one-half interest in the property. Respondent's witness testified that he was familiar with the property in question. It became clear on cross-examination, however, that the property involved in the instant case was not appraised by respondent's witness other than as farm property for which it was remarkably unsuited *263 at the time in question. Such an appraisal did not take into consideration the value of the property for subdivision purposes. In Audubon Park Realty Co., 6 B.T.A. 875, this Court rejected opinion evidence of value based on an appraisal made of property as "acre property," when it was shown that the property had a greater value for purposes of subdivision. Sales prices per acre of supposedly similar properties, to which respondent's witness testified, referred to property located several miles farther from the center of Lexington than the Walton land. Petitioner's property is one and one-half miles from Lexington. Petitioner offered the testimony of two real estate dealers who, in 1946, had made written appraisals of the property. The property was appraised as of March 1, 1913, and as of February 8, 1943, and March 1, 1943, respectively. At the time their depositions were taken, each of the witnesses had been in the real estate business in Lexington for more than 40 years. Both testified that they were familiar with and had had occasion to make valuations of land in the Lexington area on many occasions. One of the witnesses appraised the property at $250 per acre as of March 1, 1913. *264 The second appraised the property as of March 1, 1913, at $225 to $275 per acre. The 1943 dates gave rise to appraisals of $750 per acre and $700 to $800 per acre, respectively. Each of the witnesses testified that his opinion as of the time of his testimony was unchanged from that given in 1946. The testimony of these witnesses is entitled to weight. Esther Firestone, 2 B.T.A. 309. While this Court will not limit itself to opinion evidence where other more exact evidence is available, considerable weight must be given to the opinions of real estate dealers who are familiar with market values of property in the area involved. See Union National Bank of Pittsburgh v. Driscoll, 32 F. Supp. 661 (W. D. Penn., 1940). The opinions must be judged, however, by the soundness of the underlying reasoning, and due consideration must be given to the qualifications of the witnesses. H. H. Blumenthal, 21 B.T.A. 901. One witness testified that the property was worth $250 per acre and $750 per acre as of March 1, 1913, and February 8, 1943, respectively. He demonstrated a knowledge of real estate values in the area and a particular acquaintance with the property here involved. Another witness, *265 who valued the property at $225 to $275 per acre and at $700 to $800 per acre as of March 1, 1913, and March 1, 1943, respectively, did not testify with particularity as to the basis of his appraisals of the property. Respondent offered no evidence with respect to the value of the property as of March 1, 1913. In addition to the above testimony, there is available the evidence that petitioner mortgaged her property on successive dates during the 1940's. She was able to borrow $70,000 against the property on April 1, 1947. This money was received prior to any substantial improvement of the property. The amount of money which normally conservative institutions are willing to lend on a piece of property is indicative of the value thereof. Nathaniel J. Hess, 24 B.T.A. 475. The amount loaned on the property in 1947 was more than double the $30,000 value placed on the property by respondent's expert. It is reasonable to assume that the money loaned on the property was substantially less than the value placed on the property by the lending institution. It does not appear from the record that land in the Lexington area had so substantial an appreciation in the four-year period between 1943 *266 and 1947 as to make the mortgage value as of the later date irrelevant. Respondent's witness testified at one point that property for subdivision purposes would generally have had a value of about $500 per acre in 1943. He said the property here involved might have been worth $300 to $350 per acre for subdivision purposes in 1943. It is clear, of course, that, in assigning a value to property as of a given date, no consideration may be given to facts which were not known as of that date or were not reasonably capable of anticipation as of that date. The accuracy of a valuation, however, may be tested by what actually happened. Helen E. Leatherbee, 34 B.T.A. 196. In 1943 petitioner anticipated subdivision and the increased attractiveness of the property for such a purpose. Such a factor was known to one of the petitioner's witnesses who consulted with her and was familiar with subdividing activities as of the 1943 date. We are satisfied, therefore, that the property should be valued as subdivision property as of February 8, 1943. The value thereof certainly was not less than the $350 figure testified to by respondent's witness. The record discloses, however, that one-third of the *267 property remains undeveloped today because of soil conditions giving rise to sewage problems. While the specific problems which have arisen with respect to that one-third of the property may not have been known at the time, it appears that the physical nature of the property is such that one-third thereof might have been of questionable value for the purposes of subdivision. We consider it reasonable to conclude that a lesser value per acre may have obtained for subdivision purposes with respect to the one-third of the property in relatively poor condition. We conclude, therefore, that the property had a value as of February 8, 1943, of $750 per acre as to two-thirds of the acreage and of $500 per acre with respect to one-third of the land, or a total value for an undivided one-half interest of $50,000. The only evidence of the 1913 value is that presented by petitioner's witnesses. We accept the value arrived at by one of petitioner's witnesses - $250 per acre - and determine that an undivided one-half interest in the property was worth $18,750 on that date. Thus, the total basis of the property is $68,750. Decision will be entered under Rule 50. Footnotes
*. All sales to any one purchaser in a year are treated as one transaction.
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) * * * (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩