John Kessel and Myrtle Kessel v. Commissioner.
Kessel v. Commissioner
Docket No. 5323-68.
United States Tax Court
T.C. Memo 1970-266; 1970 Tax Ct. Memo LEXIS 96; 29 T.C.M. (CCH) 1171; T.C.M. (RIA) 70266; September 21, 1970, Filed Wareham C. Seaman and William F. Roberts, 2318 K St., Sacramento,Calif., for the petitioners. Nicholas G. Stucky, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined *97 a deficiency of $4,022.68 in petitioners' Federal income tax for the calendar year 1966. The only issue presented is whether petitioners' compromise settlement of a $45,557.22 debt for $30,000 entitles them to a deduction in 1966 for a wholly or partially worthless bad debt under section 166(a), I.R.C. 1954. Findings of Fact The parties have stipulated certain facts which are incorporated herein by this reference. Petitioners, John and Myrtle Kessel, are husband and wife. They filed a joint Federal income tax return for the calendar year 1966 with district director of internal revenue at San Francisco, California, and resided in Stockton, California, at the time the petition in this case was filed. John Kessel ("petitioner") was born on June 28, 1881, and thus in mid-1955 he was 74 years of age. In 1955 petitioner owned a substantial tract of undeveloped land along the Stockton channel in Stockton, California. Early in 1955 he was approached by Lloyd Bothwell ("Bothwell") who presented a proposal to build a parking lot on the channel property, construct a dock along the channel, and station a converted ferry boat there, which would be operated as a floating bar and restaurant. *98 Petitioner was not related to Bothwell by either blood or marriage. Bothwell had already acquired the S.S. General Frank M. Coxe, a former Army ferry boat, which had been built in 1921, 1172 and which had subsequently been used as an excursion vessel in San Francisco Bay until Bothwell purchased it. Bothwell acquired the S.S. Coxe at a price of $6,000, on which he made a down payment of $500. He renamed it the "Showboat", and presented his proposal to petitioner with the expectation that petitioner would develop the channel property and build the dock and that he would remodel the Showboat himself. Petitioner accepted Bothwell's proposal and entered into a long-term lease with him for use of the facilities to be constructed on his channel property. Bothwell had the Showboat towed to Stockton, and petitioner began to make the requisite improvements on his property. Bothwell, however, encountered financial difficulties in remodeling the Showboat, and despite prior representations to petitioner that he had adequate financing, Bothwell sought a loan from petitioner to complete the project. Since he had already entered into a long-term lease with Bothwell and since he had also started *99 to improve his own property in preparation for the opening of the Showboat, petitioner [1] made a series of loans to Bothwell. As a result of the loans, Bothwell was able to remodel the Showboat during 1955, and the bar and restaurant were opened to the public in December of that year. By that time, Bothwell had incurred approximately $79,000 in indebtedness to petitioner and other creditors in order to begin to operate the Showboat as a bar and restaurant. The Showboat was approximately 140 feet in length, with a 30-foot beam and a 12-foot draft. It had a steel hull, a wooden superstructure, and two decks for entertaining. On the main deck were a bar and cocktail area, a dance floor, and a dining room. The upper deck included another dining room and a galley. The Showboat had no motive power of its own and thus had to be towed in order to move. The bar and restaurant proved unprofitable initially, and during the next two and one-half years petitioner made additional loans to Bothwell *100 in order to keep him in business. By mid-1958 petitioner had loaned Bothwell a total of approximately $50,000 in cash - including the loans made prior to December 1955. One night in mid-1958, without giving notice to petitioner, Bothwell had the Showboat towed from Stockton to the Oakland Estuary in Oakland, California, about 75 miles away. There Bothwell again attempted to operate the Showboat as a bar and a restaurant. In order to purchase a new liquor license, acquire a new location, construct a parking lot, and install other necessary facilities at his new location, Bothwell incurred additional indebtedness. Again the venture proved unsuccessful, and approximately one year after opening to the public on the Oakland Estuary, Bothwell moved the Showboat once more, this time to Jack London Square, a waterfront location approximately three miles away on the Estuary, where a number of other restaurants were situated. There he reopened the bar and restaurant to the public. Throughout the period extending from the opening of the restaurant in Stockton in late 1955 until the time when Bothwell moved the Showboat to Jack London Square in mid-1959, petitioner and his attorney, Wareham *101 C. Seaman ("Seaman"), made frequent and insistent attempts to collect the amounts owed by Bothwell. While the Showboat was still in Stockton, petitioner had breakfast with Bothwell several times a week, and on numerous occasions Seaman called Bothwell into his office to discuss repayment of the debt. However, their efforts were unsuccessful. Even after the Showboat was towed to Oakland in 1958, petitioner and Seaman made numerous telephone calls and occasional visits to Bothwell, urging him to repay the amounts owed. However, Bothwell informed them that the bar and restaurant continued to be unprofitable, that he was in debt to a number of creditors, and that he lacked funds with which to repay the loans. By December 1959, after he had moved the Showboat to Jack London Square, Bothwell owed petitioners a total of $60,000. On December 22, 1959, as a result of the efforts of petitioner and Seaman, Bothwell and his wife, Mercedes Bothwell, executed a 5-year promissory note in the face amount of $78,000, payable in 60 equal successive monthly installments to Seaman, as trustee, for the benefit of petitioner and his wife. The face amount of $78,000, represented the $60,000 principal amount *102 then owed by Bothwell plus $18,000 in interest at six percent over a 60-month period. The 1173 promissory instrument provided that Bothwell and his wife were jointly and severally liable on the note and that [if] any installment be not paid when due, then the entire amount owing and unpaid or under it at the election of the holder hereof, forthwith, will become due and payable and notice of such election is hereby waived. If suit is brought on this note to enforce payment thereof, the undersigned jointly, severally and separately promise to pay a reasonable attorneys' fee. The undersigned hereby waive: (a) Presentment, demand, protest, notice of dishonor and notice of non-payment; (b) The right, if any, to the benefit of, or to direct the application of any security hypothecated to the holder, unless all indebtedness of the maker to the holder, however arising, shall have been paid. As security for the note, the Bothwells mortgaged to Seaman, for the benefit of petitioners, the Showboat and its equipment, furniture, fixtures, and utensils. The mortgage instrument provided in part: It is also agreed that if the Mortgagors fail to make any payment as in said promissory *103 note provided, or shall fail to make payment of any other monies secured hereby, then the Mortgagee may take possession of said property, using all necessary force to do so, and may immediately proceed to sell the same in the manner provided by law, and from the proceeds pay the whole amount of the debt or debts secured by this Mortgage and all costs of sale, including counsel fees not exceeding ten (10%) percent upon the amount due, paying the surplus to the Mortgagors and for the purpose of taking possession of and selling said property, the Mortgagors do hereby appoint the said Mortgagee their attorney irrevocable, with full power of substitution and revocation. This Mortgage is also given as security for the repayment of sums that may be advanced, expenditures that may be made, or indebtedness or obligations that may be incurred subsequent to the execution hereof, up to and including the sum of Eighty Thousand and NO/100 ($80,000.00) Dollars. The mortgage was executed on December 22, 1959, and recorded on January 7, 1960, in Alameda and San Joaquin Counties, California. During its first five or six years at Jack London Square, the Showboat produced but little profit. Also *104 during that period Bothwell was subject to a number of attachments by his creditors, and various liens were filed against his property and subsequently "cured". Within a few months after execution of the $78,000 note in 1959, the Bothwells were in default, and therefore became currently liable for the entire unpaid portion of the obligation. At some undisclosed time prior to 1965 or 1966 Bothwell made certain efforts to have the Showboat listed for sale. However, the vessel was not advertised for sale, and Bothwell's efforts were apparently confined to arrangements of an unspecified character with two brokers in the San Francisco Bay area. His asking price was "[anywhere] from $75,000 to $125,000", but he never received a firm offer for the Showboat. By 1964, Bothwell had paid about $3,500 to $5,000 in liquidation of his $78,000 debt to petitioners. In February of 1964, petitioners agreed to settle the debt by accepting a $30,000 payment from Bothwell. However, the attempted compromise failed when Bothwell informed petitioners that as a result of his inability to secure a bank loan to finance the $30,000 payment, he would be unable to complete the settlement. Later in 1964 *105 petitioner and Bothwell negotiated a payment plan which called for Bothwell to make payments of $125 per week into a bank account in petitioner's name. Bothwell subsequently made sufficient payments to create a fund of approximately $1,500 (or the equivalent of some 12 payments), but petitioner for some unexplained reason did not receive that sum until 1969. During 1965, the year following adoption of the payment plan, Bothwell revived the proposal to compromise the debt by payment of $30,000. Petitioner conferred with Seaman who advised him to accept the offer. Petitioner followed Seaman's advice and agreed to Bothwell's offer in December of 1965. On January 5, 1966, Bothwell owed petitioner $45,557.22 in principal on the 1959 note, and on that date, Seaman assigned the Bothwells' note and mortgage to the First National Bank of Oakland (the "Bank") as consideration for payment of $30,000 for the benefit of petitioners. A letter from Seaman's office to the Bank accompanied the note, mortgage, and assignment instruments and provided in part: You are authorized to release these documents for delivery to your customer and/or recordation when you have for our account your check or *106 money order in the principal amount of $30,000.00 and your check in payment for our services of $100.00. 1174 Seven days later, on January 12, 1966, the Bank and the Bothwells paid Seaman $30,000 for the benefit of petitioners. The sum of $30,000 was part of a $45,000 loan made by the Bank to the Bothwells during January of 1966. However, $5,020.42 of the remaining $15,000 was used only to pay off a prior loan to Bothwell from the Bank. The proceeds of the loan were distributed as follows: Wareham Seaman - Trustee
$30,000.00
Wareham Seaman - Attorney fees
100.00
Bank's attorney's fees
150.00
To pay off prior loan due bank from Bothwell
5,020.42
Remitted to Bothwell 9,729.58
$45,000.00 The sum of $9,729.58 was to be invested in new carpeting and a new exterior for the Showboat. In addition to the items covered by the 1959 mortgage assigned to the Bank by Seaman, the Bank obtained as collateral for its loan all of the Showboat's liquor inventory stored on the premises and in warehouses, all equipment acquired since the execution of the 1959 mortgage, and all after acquired equipment and accessions to equipment. The record does not disclose the value *107 of any of the items of such additional collateral. At the time of the compromise of the debt, Seaman was not aware of the amount of the Bank's loan to the Bothwells. On December 23, 1965, Bothwell submitted a "Financial Statement" to the First National Bank of Oakland, as of October 31, 1965, in which he listed total assets in the amount of $195,548.34, total liabilities of $78,550, and a net worth of $116,998.34. The boat was valued at $150,000 plus $13,133.97 for fixtures. The Statement also contained a profit and loss statement for the period January 1965 to October 1965 in which "Net Profit from Operations" for such period was shown as $16,788.12. The Statement represented that petitioner's books were audited by outside accountants (Henderson, Henderson & Taggart), and that the date of the last audit was December 31, 1964. In a subsequent balance sheet prepared by Henderson, Henderson & Taggart as of August 31, 1967, without audit, the boat was listed at a "market value" of $175,000. In January of 1966 the fair market value of the Showboat's tangible assets, exclusive of the value of its bar and restaurant business, was not less than $45,557.22. In 1966, the Showboat became *108 markedly more profitable than it had been previously. The Bothwells' income tax returns for the calendar years 1964 through 1967 reported the following income derived from the Showboat: Net income
Net income
before
after
depre-
Depre-
depre-
clation
clation
clation
1964
$ 9,040.04
$9,995.73
($ 955.69)
1965
15,835.83
9,553.66
6,302.17
1966
36,649.48
4,712.66
31,936.82
1967
50,619.99
5,034.94
45,585.05 The increase in income in 1966 was attributable in part to the fact that a fire eliminated the Showboat's nearest competitor and stimulated an increase in the Showboat's business. On their 1966 joint income tax return petitioners claimed a business bad debt deduction in the amount of $15,557.22 which they attributed to settlement of the Bothwells' note during that year. Subsequently, petitioner received $1,564.23 from the bank account which had been established in his name as part of the payment plan initiated in 1964. Petitioners have conceded that the claimed business bad debt deduction should therefore be reduced by $1,564.23. Opinion RAUM, Judge: The only question presented is whether, as a result of their settlement *109 of the Bothwells' debt for $30,000 in 1966, petitioners are entitled to a bad debt deduction pursuant to section 166(a), I.R.C. 1954. [2] The Commissioner contends that petitioners have failed to establish that the Bothwells' debt became worthless, in whole or in part, in 1966, and that they are therefore not entitled to the deduction. We agree. Petitioners have argued that the claimed deduction is authorized by section 166(a), but they have not specified whether their claim is based upon paragraph (1), relating to wholly worthless debts, or paragraph (2), relating to partially worthless debts. Similarly, the Commissioner has made no distinction between the two paragraphs. There has been some confusion and a certain amount of possible inconsistency among 1175 the judicial *110 decisions as to whether a compromised debt may be viewed as partially worthless or wholly worthless.[3] The distinction may be significant. For instance, section 166 does not authorize a deduction for a partially worthless non-business bad debt. Section 166(d) (1). See Rollins v. Commissioner, 276 F. 2d 368, 372 (C.A. 4); Miriam Coward Pierson, 27 T.C. 330, 338, affirmed 253 F. 2d 928 (C.A. 3); 5 Mertens, Law of Federal Income Taxation sec. 30.24. Furthermore, the taxpayer's burden of proof is more difficult to sustain if he claims a deduction as a partially worthless bad debt. Section 166(a) (2); Regs. section 1.166-3(a)(2)(i) and (iii); Dodd v. Commissioner, 298 F. 2d 570, 579 (C.A. 4), affirming a Memorandum Opinion of this Court, and cases cited therein.
However, the parties appear to be in agreement that the *111 debt in question was a business debt. And because we conclude that petitioners have failed to sustain their burden of proof under either paragraph (1) or paragraph (2), we need not reach the question of which paragraph is applicable here. Bothwell's debt to petitioners was secured by the Showboat and its equipment, furniture, fixtures, and utensils. The only evidence offered by petitioners to demonstrate that the value of the Showboat was less than the amount of the $45,557.22 debt was Bothwell's vague testimony concerning his unsuccessful efforts to sell the boat. However, his asking price of $75,000 to $125,000 was such that his failure to sell the vessel indicates little about the Showboat's value in relation to the $45,000 debt. Furthermore, Bothwell's testimony was murky, and we are not satisfied that his efforts to sell the Showboat were seriously pressed. On the other hand, at the trial herein, the Commissioner presented a marine surveyorengineer who had appraised the Showboat in July of 1963 and January of 1969 and who testified that, on the basis of those appraisals, his estimate of the Showboat's value in 1966 was approximately $85,000. And although there is reason to *112 believe that his estimate was somewhat inflated, his testimony was more persuasive than any evidence offered by petitioners. Furthermore, the Bank's willingness to lend $45,000 to the Bothwells in January of 1966 offers further support for the Commissioner's determination. [4] We note also that in a financial statement as of October 31, 1965 which Bothwell submitted to the Bank, he valued the boat at $150,000 plus $13,133.97 for fixtures. We conclude the petitioners have failed to carry their burden of proof under both paragraph (1) and paragraph (2) of section 166(a). In the circumstances we do not pass upon the Government's further contention that even if the debt did become worthless, such worthlessness occurred *113 in 1965 when petitioner accepted Bothwell's compromise offer rather than in 1966 when the details of the settlement were actually carried out. Decision will be entered under Rule 50. Footnotes
1. The stipulations made by the parties refer to both petitioner and his wife as Bothwell's creditors. However, for convenience petitioner alone will sometimes be referred to as Bothwell's creditor.↩
2. SEC. 166. BAD DEBTS. (a) General rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
3. Compare Henry v. United States, 180 F. Supp. 597 (Ct. Cl.), and Annie B. Smith 12 T.C.M. 131, with Bingham v. Commissioner, 105 F. 2d 971 (C.A. 2), and James R. Stewart 39 B.T.A. 87, acq. 1942-1 C.B. 16. Cf. Ardela, Inc. 28 T.C.M. 470↩.
4. We recognize that $5,020.42 of the loan was used to pay off a prior loan from the Bank, and that the $9,729.58 received by Bothwell was invested in new carpeting and a new exterior for the Showboat. Nevertheless, we doubt that the Bank would have loaned Bothwell $45,000 unless it considered the Showboat's value to exceed that amount. Cf. Nathanial J. Hess 24 B.T.A. 475, 478, acq. XI-1 C.B. 4; Estate of Samuel B. Walton 21 T.C.M. 346↩, 352.