**INVESTERS DIVERSIFIED SERVICES, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 17294.**

United States Court of Appeals
Eighth Circuit.

Dec. 13, 1963.

Joseph A. Maun, St. Paul, Minn., and Kenneth M. Anderson, Minneapolis, Minn., made argument for petitioner and were on the brief with counsel, Maun, Hazel, Green, Hayes, Simon & Aretz, St. Paul, Minn., and Cant, Haverstock, Beardsley, Gray & Plant, Minneapolis, Minn.

Harry Marselli, Atty., Tax Division, Dept. of Justice, Washington, D. C., made argument for respondent and Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Gilbert E. Andrews and Crombie J. D. Garrett, Attys., Tax Division, Dept. of Justice, Washington, D. C., were on the brief.

Before VOGEL, MATTHES and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Investors Diversified Services, Inc. (hereinafter called "Petitioner") has petitioned us to review a decision of the Tax Court affirming the disallowance of income tax deductions and a claimed refund by the Commissioner of Internal Revenue Service. See 39 T.C. No. 25.

During the years in issue, 1954 and 1955, Petitioner engaged, inter alia, in the sale of loans secured by mortgages to wholly owned subsidiary corporations and non-affiliated purchasers. The gravamen of the petition for review is that as a result of these sales it sustained tax deductible losses within the purview of § 165 of the Internal Revenue Code of

1954 [1] and that a portion of the losses attributable to sales to non-affiliates in 1955 was erroneously reported as capital losses when they were actually ordinary losses thereby giving rise to an overpayment of tax and the instant claim for refund.

From its incorporation in 1894 until December 31, 1940, before the enactment of the Investment Company Act of 1940, 15 U.S.C.A. § 80a–1 et seq., Petitioner was in the business of issuing face-amount certificates. These certificates evidenced the obligation of Petitioner to pay the holders thereof designated amounts upon maturity. Petitioner invested the amounts which its certificate holders paid it in real estate mortgages and certain securities.

The National Housing Act was enacted by Congress in 1934, 12 U.S.C.A. §§ 1701–1750. Created thereunder, the Federal National Mortgage Association (hereinafter referred to as "FNMA") was a government agency formed to purchase insured mortgages from approved mortgagees such as Petitioner. FNMA provided a secondary market for mortgage loans should the market be such that mortgages could not be sold to conventional sources.

Prior to the enactment of the National Housing Act, Petitioner received an interest rate on its mortgage loans greater than the increment requirement owed the holders of its face-amount certificates. These mortgage loans were of the conventional type (as distinguished from government insured or fully or partially guaranteed by the government) and were usually on an amortized basis for a term of twelve years, eight and two-thirds months, bearing an interest rate of seven per cent. Petitioner's face-amount certificates bore interest rates of from five to six per cent. With the passage of the National Housing Act and the resulting decrease in mortgage loan interest rates, Petitioner became unable to earn sufficient profit to maintain reserves in an amount adequately securing its outstanding face-amount certificates.

The Securities and Exchange Commission (hereinafter referred to as "SEC") in early 1940 examined Petitioner's assets to determine whether its reserves were sufficient to meet its obligations owed certificate holders. Its reserves were deemed inadequate by some thirty to thirty-three million dollars. Therefore, in compliance with the requirements of the Investment Company Act of 1940, Petitioner discontinued the issuance of face-amount certificates on December 31, 1940.

This prompted Petitioner in that same year to organize Investors Syndicate of America, Inc. (hereinafter referred to as "ISA"), a wholly owned subsidiary incorporated under the laws of Minnesota and having as its principal place of business Minneapolis. Since 1941 ISA has issued face-amount certificates. Petitioner and ISA are registered investment companies under the provisions of the Investment Company Act of 1940 and classified thereunder as "affiliated persons" [2] This Act requires that a majority of the board of directors of ISA be persons not affiliated in any way with Petitioner, 15 U.S.C.A. § 80a–10. Although only three of ISA's eight directors were also members of Petitioner's board during the years in issue, from 1940 through 1955 ISA had no personnel of its own and its entire operations were

---

1. § 165(a) and (b) provide:
 "(a) There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
 "(b) For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in § 1011 for determining the loss from the sale or other disposition of property."

2. 15 U.S.C.A. § 80a–2: " 'Affiliated person' of another person means * * * (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person * * *."

conducted by Petitioner. Since 1940 Petitioner was liquidating its own face-amount certificates, acquiring part of its income to pay the increment requirements of these certificates from money loaned on mortgages at interest. To accomplish its mortgage activities, Petitioner established throughout the United States some twenty branch offices which served the functions of both Petitioner and ISA.

Petitioner was not qualified to sell face-amount certificates under the laws of New York State, so prior to 1940 it acquired another wholly owned corporation, Investors Services Title and Guaranty Company (hereinafter referred to as "IST&G"). IST&G was a corporation qualified to do business in New York where it maintained its offices and had its own separate sales organization.

The Investment Company Act of 1940 prohibited sales of securities between related investment companies which were affiliated as Petitioner and ISA unless exempted by an order of the SEC. On November 13, 1941, the SEC upon application by Petitioner issued an order authorizing sales of mortgages between Petitioner and ISA upon a showing by Petitioner that such sales were in the interest of the public and the investors.[3] The exemption order was periodically renewed remaining in effect throughout the years 1954 and 1955, when the mortgage sales, the subject of this review, occurred. From 1948 through 1955 Petitioner sold substantial quantities of mortgages to ISA as well as some to IST&G under written agreements executed by Petitioner, ISA and IST&G, setting forth as the consideration for such sales basically the terms outlined in SEC's original exemption order, vis-a-vis Petitioner and ISA. Pursuant to these agreements, mortgages in excess of Petitioner's investment needs were sold as rapidly as possible so as to enable it to originate more mortgages.

In 1943 Petitioner decided to increase its profits by engaging in so-called "participation projects" with affiliated builders of housing projects. Petitioner embarked on such a project but was precluded from pursuing the venture to completion at this time due to sanctions imposed by the SEC for reasons unrelated to the facts culminating in this review. In 1946, these sanctions were removed, whereupon Petitioner reinaugurated the participation projects with affiliated builders. Petitioner financed the acquisition of raw land, the construction of houses and origination of mortgages on the property sold, in exchange for an interest in the profits realized from the development of the subdivision. To acquire a share of such profits, Petitioner either organized a wholly owned subsidiary to be the builder, obtained a 49% stock interest in a builder, or took a contractual interest in the builder's profits. In addition to an interest in the profits of the builder, Petitioner also derived income from the projects from interest on interim construction loans, fees charged the builder for making construction loans, fees charged the purchaser for making permanent loans, commissions on fire and casualty insurance on the properties, as well as fees for servicing the mortgages sold. Petitioner, being an approved mortgagee, would on occasion when the projects were originated obtain future commitments from FNMA to purchase the mortgage loans.

From the inception of the projects through February, 1954, Petitioner, despite slight fluctuations in the market, received par value or premium price from the sale of these mortgages to its subsidiaries (ISA and IST&G), FNMA under a prior commitment or non-affiliated pur-

3. The SEC exemption order provided that the price at which such sales should be made was to be an amount equivalent to the unpaid principal amount of the loan at the date of sale or the cost of the loan to Petitioner, whichever was less. It also permitted Petitioner to charge a premium in an amount not to exceed 1½% of the principal amount of the mortgage loan involved in the transfer to the subsidiary, or the amount of Petitioner's investment.

chasers. During this approximate period, Petitioner's operations produced twenty to twenty-five million dollars in profits over and above other profits and ordinary interest income on mortgage loans and securities held by Petitioner for investment. The slight monthly fluctuations in the mortgage market values apparently did not affect in any substantial way Petitioner's operations or its ability to dispose of its mortgages for par or a premium. However, in the summer or early fall of 1953 the mortgage market took a substantial decline, resulting in mortgage loans selling at below par. Under the National Housing Act, when Petitioner funded a mortgage to the purchaser of a house it was required to pay the full face amount to the mortgagor or borrower regardless of the prevailing mortgage market. The upshot of this disparity was that beginning in the fall of 1953, Petitioner paid par for mortgages which at the time originated had a market value of substantially less than par. Petitioner usually originated its participation project mortgages from six months to two years from the commencement of the project.

When the mortgage market was below par and mortgages were selling at a substantial discount, it was the permissible practice under the Federal Housing regulations for a lender to charge the seller or builder a fee for originating a permanent mortgage to compensate for the mortgage discount. Petitioner did not avail itself of this practice. Instead, when the mortgage market fell in 1953, Petitioner followed the practice of having its branch office where the proposed project was located investigate the venture, determine the actual mortgage market values in the particular area and submit findings as to market value to Petitioner's mortgage committee. Petition-

er also established the following accounting procedures to reflect its sales of the originated mortgages funded at par and sold to its subsidiaries and non-affiliates below par. Petitioner through its mortgage committee at the time the participation project was approved would determine for each project an amount representing the fair market value for the mortgages in the project area based on current market conditions as established by its personnel in the area's branch office. Petitioner then computed the percentage that the fair market value so determined bore to the face amount of the mortgage and set up the difference between the two amounts as a discount rate on the mortgage even though the Petitioner advanced the face amount of the mortgage to the mortgagor. This discount rate so computed (after a 50% reduction to take into account additional income tax liability which would have resulted from additional profits) [4] was applied to each of the permanent mortgage loans emanating from the project by means of a credit to deferred income account which was then amortized (for book but not for tax purposes) over the life of the mortgage. Petitioner's chief accounting officer testified that this procedure was adopted to prevent overstating its assets and its net after taxes earnings from its building subsidiaries when Petitioner had to pay par value for a mortgage it subsequently could only sell at a discount because of depressed market conditions.

When the permanent mortgage loan was later sold to ISA or IST&G, the selling price was determined by subtracting the unamortized portion of the computed discount for that mortgage from its unpaid principal balance at the date of the sale. As subsequently set forth mathematically, the difference be-

4. One of Petitioner's witnesses testified that the 50% reduction was to take into account the taxes paid by the subsidiary corporate builder on the increased profits caused by Petitioner's funding the mortgages at par without charging the subsidiary a fee. However, Petitioner's witnesses provide no explanation as to why the reduction was 50% with respect to participation projects in which Petitioner was only a part owner in the builder or had only a contractual interest in the earnings of the builder if, in fact, any of the mortgages here involved were originated from such projects.

tween the funded par value and this computed sale price constituted Petitioner's claimed respective tax deductible losses on mortgage sales. There is no evidence in the record of trial that Petitioner at the time of these sales redetermined the fair market value for the mortgages sold even though as much as six months to two years had elapsed since the participation projects were approved, the date on which the mortgage values were first fixed at less than par.[5] Nor did Petitioner present any evidence establishing a comparative value relationship between the artificially discounted price it charged its subsidiaries for the mortgages and the market value of these types of mortgages at the time of the sales. Moreover, despite the testimony of Petitioner's expert witnesses that the discounted mortgages were "not sold for less than fair market value", the record is also devoid of any specific evidence indicating what the fair market value even was at the time of the sales for the mortgages for which tax deductible losses are claimed. While some of Petitioner's witnesses did testify that it was possible, it is also indeterminable from the record whether or not any of said sales ever netted Petitioner a price in excess of the fair market value at the time of a particular sale.

Petitioner used as its cost basis for tax purposes the figure of par reduced by principal payments. It computed losses for tax purposes based on the difference in this cost basis and the sale price to the subsidiaries which price was arrived at by subtracting from the unpaid principal balance of the mortgage the unamortized portion of the computed discount, in turn, computed by means of the artificial formula hereinabove described.[6]

Petitioner was able to sell all its mortgages to non-affiliates in 1954 at no loss, obtaining par value as most of the mortgages were sold to FNMA under a par commitment while the remainder were sold under special circumstances unaffected by the then prevailing discounted market conditions.

In 1955 Petitioner sold mortgages to non-affiliates receiving an aggregate amount therefor of $3,275,134.77. Its "adjusted cost basis" thereof was $3,-377,602.43, resulting in a claimed loss of $102,467.66. In its 1955 tax return, Petitioner contended it mistakenly reported the loss as capital. In its petition to the Tax Court for a refund of $28,-521.78, Petitioner asserted that this item should have been deducted as an ordinary loss, contending these mortgages had been held by Petitioner for sale to customers in the ordinary course of its trade or business and not for investment purposes. Petitioner's proof consisted of testimony to the effect that Petitioner originated mortgages in amounts exceeding its capacity to fund permanently and resold relatively soon after origination many of these mortgages resulting in an immense volume of sales for 1955 and years preceding. The Tax Court denied the refund and held the item to be a capital loss, finding no evidence relating to the manner in which these mortgages were acquired, the period they were held or the reason they were sold. It relied also on findings that Petitioner held some of its mortgages as an investment reserve against its outstanding face-amount certificates and reported gains on the sales of mortgages to non-affiliated purchasers as capital gains for the years 1948 through 1953 and as capital losses for the year 1955.

---

5. During the years 1954 and 1955 most of the mortgages assigned by the Petitioner to ISA had been held by it for not more than three or four months after origination with the house purchasers. However, in all cases, Petitioner's commitments in the participation projects were usually given six months prior to origination. Therefore, the fair market value of the mortgages used by Petitioner in computing the sales price to ISA as well as IST&G, on the prior commitment date, was a value determined as of a time at least eight or ten months before the date of sale.

6. See footnote 4 and accompanying text, supra.

In 1954, Petitioner sold mortgage loans to its subsidiaries, ISA and IST&G, for which it received $55,635,126.81. The "adjusted cost basis" of these mortgage loans on its books was $56,336,485.65 or a difference of $701,358.84 which was taken as a deduction on its return, disallowed by the Commissioner and the disallowance affirmed by the Tax Court.

For the year 1955, the Petitioner received from the sale of mortgage loans to ISA and IST&G the sum of $71,673,-794.33. The "adjusted cost basis" of these mortgage loans on its books was $72,280,322.09 or a difference of $606,-527.76. This difference was taken as a deduction in its return for the year 1955, disallowed also by the Commissioner and the disallowance affirmed by the Tax Court.

In 1950 Petitioner acquired certain mortgage loans known as the Telesyndicate Project Loans. The properties securing the mortgages were twenty to twenty-five years old at the time Petitioner acquired them. This was not a participation project wherein Petitioner developed raw tracts of land and originated mortgages thereon. At the time Petitioner acquired these loans it received a fee of 9½% of the unpaid principal amount of the loan. It included this fee in its income for the year 1950 in computing its federal income tax. Petitioner on its books placed the fee received and reported as income in a valuation reserve account which it amortized over the life of the mortgage for book purposes but not for income tax purposes. Petitioner treated the accounting of these mortgage fees much in the same manner as its book reporting of the mortgages sold at discount. In 1954 and 1955, Petitioner sold these mortgages to ISA for a price equal to the unpaid principal balance less the unamortized portion of the book valuation reserve. Of the loss in the amount of $701,358.84 sustained in 1954, all of which was disallowed by the Tax Court, $127,300.00 relates to this particular item. Of the loss of $606,527.76 sustained in 1955, all of which was disal-

lowed by the Tax Court, $128,394.73 relates to this item. The Tax Court rested its decision primarily on a factual determination that the record of trial was absent of any probative evidence establishing the sales price of the Telesyndicate mortgages as indicative of the fair market value of these mortgages at the date of their sale to ISA four to five years after acquisition by Petitioner. It also found Petitioner was precluded from claiming the instant deduction because its transactions with a completely dominated subsidiary were not recognizable for tax purposes. Citing Crown Cork International Corporation v. Commissioner, 4 T.C. 19 (1944), aff'd. per curiam 149 F.2d 968 (3rd Cir. 1945).

The issues involved are whether Petitioner sustained income tax deductible losses on sales of mortgages to its two wholly owned subsidiaries during the years 1954 and 1955 and whether losses sustained by Petitioner on sales of mortgage loans to non-affiliated vendees during the year 1955 are deductible as ordinary losses.

*The Cost Basis:* The threshold question is the cost basis of the property for tax purposes. Ordinarily, this poses a simple problem because generally the purchase price is indeed the cost price.

Petitioner here, however, is in the juxtaposition of dealing both with its affiliated building companies related to it in different degrees as well as with its wholly owned subsidiaries. Such a situation in itself certainly does not imply anything improper in the ensuing transactions but does require scrutinization of the factual situations.

We are concerned first with transactions stemming from origination of mortgages by Petitioner through its affiliated builders and their sale in the years 1954 and 1955. The so-called Telesyndicate Project mortgages were acquired from an unrelated source and will be dealt with separately. With the sharp break in the market occurring in the summer of 1953, other significant changes became effective in the structure of Petitioner's operations. In August

of that year, Petitioner installed a new president and policy changes were made under his guidance. By this time Petitioner's profits for the years immediately preceding had been so huge that it no longer had a deficit of reserves. ISA also had prospered and was investing heavily in tax free municipal bonds. The new president was concerned with Petitioner's engagement in the participation projects, instituting a program of gradual withdrawal coincident with his arrival. He was also concerned with the funding of mortgages originated by affiliated builders at a substantial excess of their market value and the sale thereof to wholly owned subsidiaries. It was at this juncture that Petitioner instructed its branch offices to determine the fair market value of the mortgages in the participation project areas and forward this information with recommendations to Petitioner's mortgage committee. This committee would determine whether or not to approve the project and, if approved, the fair market value at that time was indicated on the mortgages. The difference between the fair market value and par was a basic ingredient in the formula producing the ultimate sale price of the mortgages to Petitioner's wholly owned subsidiaries. It was in December of 1953 when the contracts between Petitioner and its wholly owned subsidiaries were rewritten eliminating the provision authorized by the SEC for the payment to Petitioner as a single premium at the time of the transfer or sale in the amount of 1½% of the principal amount of the loan. This novation was not brought to the attention of the SEC until 1956 by joint petition of ISA and IST&G.

On July 28, 1953, the Federal Housing Commission recognized the need for alleviation of discounted market conditions. Therefore, its administrative rules were amended to permit a mortgagee such as Petitioner to charge a builder or any other interested party, except the mortgagor, a fee in an amount to cover any discount to reimburse the mortgagee for any loss which it might suffer in the bona fide sale of the mortgage. Subsection 11 of Section III, Administrative Rules of the Federal Housing Commissioner, July 28, 1953.

The Tax Court was of the opinion that Petitioner's election to forego the charging of a fee to the builders was tantamount to a contribution to the capital of its affiliated builders. The Tax Court thus determined that under the circumstances par or funded price was not the proper cost basis for tax purposes.

Petitioner contends that because the Tax Court concluded its transactions were not at arm's length, they were not "bona fide". Hence, it would have been illegal to charge the affiliated builder a fee to compensate for the difference in market value and the price Petitioner was required to pay to fund the mortgage. (Interestingly enough, Petitioner inconsistently argues in another breath that the transactions were bona fide.) Petitioner's contention on this point is erroneously premised because many transactions are bona fide even though not conducted at arm's length.

Petitioner also submits that it would make no difference taxwise to Petitioner's shareholders whether the allowed fee was charged the builder or not because it filed consolidated returns for the years 1949 through 1953. Further, Petitioner asserts that if it could have charged, but did not charge, a fee and was using a subsidiary as a builder, the subsidiary would have to pay the tax on the excess income. Petitioner claims that in either event the federal government would have received the same amount in taxes. This argument is without evidentiary support. In the case at bar, we are dealing with Petitioner's alleged losses for the years 1954 and 1955 during which years Petitioner *did not* file consolidated returns. As late as early 1954 Petitioner was still selling its mortgages to its subsidiaries at par. It did not return to the practice of filing consolidated returns until 1956, after the years involved in the transactions at issue.

Petitioner dealt with builders affiliated to it in various degrees. Petitioner's

principal witness testified that the Petitioner's share of the profits of its subsidiaries would not be income to Petitioner until received either as a dividend from a subsidiary, a liquidating dividend or a profit from the sale of its stock in the subsidiary company. Petitioner did not show what types of affiliated builders were involved in the mortgage transactions. Those not wholly owned would not be included in the consolidated returns for the preceding year. More glaringly omitted from Petitioner's proof is its failure to establish the tax bracket of its "affiliated builders". In addition to the nature of the source of Petitioner's profits, the form in which the profit was derived could dictate the rate of tax. Further hypothesis on this point is unfruitful, as the record is completely barren of any evidence to support Petitioner's argument.

Petitioner's chief accounting officer testified that if they had received a fee for funding a mortgage the real cost of the mortgage to Petitioner would be the fair market value of the mortgage at that time. Quoting from his testimony:

"[I]f we were funding a mortgage for the full amount of $10,000 and we were receiving a fee for doing that of five per cent or profits in a subsidiary corporation, the cost to us, real cost of the mortgage we were acquiring, would depend upon the fair market value of the mortgage at that time."

■ All Petitioner's citations on cost basis are of no aid as each deals with the theory of aggregation which is inapplicable in light of the facts of this case. With Petitioner's comprehensive bookkeeping system, individual allocation of cost for each mortgage involved was not outside the realm of the possible, so as to bring into play tax aggregation principles. It is axiomatic that purchase price is not necessarily the proper cost basis in transactions which are not conducted at arm's length or motivated by other peculiar considerations which influence the taxpayer who gives a price in excess of the fair market value. 3A

Merten's, Law of Federal Income Taxation, § 21.42, at 102.

This Court in Majestic Securities Corporation v. Commissioner, 120 F.2d 12, 15 (8th Cir. 1941) stated:

"The amount paid in the acquisition of property is usually regarded as the cost of such property under the statute, but this is not always nor necessarily true. The question has been before the federal courts frequently, and the problem has been considered from various angles. In the following cases a stockholder or employee purchased stock for less than its current market value, and for particular circumstances present in each case the differential was held not to represent a part of the cost * * *."

Noting a number of cases where purchases were made for less and some for more than the current market value, the Court concluded:

"All of the cases cited show that the amount paid at the time of the acquisition of property is not conclusive as to the cost within the meaning of the statute." Majestic Securities Corporation v. Commissioner, supra, 120 F.2d at 15.

■ The reasonable inference to be drawn from Petitioner's election to forego the fee is that Petitioner desired to bestow upon its affiliates a benefit to the extent of the fee. While this may not be a tangible transfer of income earned, it certainly is equivalent to the types of income-shifting transactions condemned by the rationale of the Majestic Securities Corporation case and the authorities cited therein. Based on this rationale, the Tax Court properly found that the amounts paid for the funding of the mortgages by Petitioner are not conclusive as to the cost for tax purposes within the meaning of the statute.

The fact that deductions of losses are a privilege, not a right, and are in fact a matter of legislative grace cannot be overlooked. The revenue statute in question does not permit consideration of

losses except where they are not "compensated by insurance or otherwise". These alleged losses were not compensated by insurance but they were compensable "otherwise" if Petitioner had collected a fee from the builder so as to recoup its loss. The rule is succinctly stated in 5 Merten's, op. cit. supra, § 28.08 at 21:

> "The taxpayer must exhaust his remedies to recover or to reduce his loss."

The situation here is analogous to cases such as Acheson v. Commissioner, 155 F.2d 369 (5th Cir. 1946), wherein it was held that the fact that the debtor was the taxpayer's son and she might, therefore, be unwilling to enforce payment does not entitle the taxpayer to a bad debt deduction when the possibility of recoupment existed. To the same effect is H. D. Lee Mercantile Company v. Commissioner, 79 F.2d 391 (10th Cir. 1935).

Concededly, Petitioner received consideration in the form of benefits to related companies on account of its funding the mortgages at par. Under these circumstances, the fair market value, rather than par, is the proper cost basis for income tax purposes.

*The Sales Price:* Petitioner contends that the mortgages were sold to its subsidiaries for a price that was fair and reasonable and at not less than fair market value.

The sales price of these mortgages to Petitioner's subsidiaries was based upon the described formula commencing about August of 1953 when the market value of the mortgages was substantially less than par.

Illustrated hypothetically, if the mortgage had a par value of $10,000, but the market value of said mortgage was $9500 at the time Petitioner elected to enter into the participation project, the discount would be $500. As previously explained, Petitioner would reduce this discount by 50% for theoretical tax liability, and thus, the ultimate sale price to the subsidiary would be $9750.

Petitioner challenges the Tax Court's labelling this "sale price" a product of an artificial formula. Nevertheless, the formula will not even stand the test of good common sense in view of its erroneous assumptions. The testimony is undisputed that the mortgage market fluctuated monthly as well as to locality. This formula presumptuously assumes that the market value at the time of Petitioner's decision to enter into a participation project remained the same for six months and possibly two years later when it sold the mortgages to its subsidiary without redetermining market values. Admittedly, that was not the case. It was also artificial to assume an arbitrary 50% tax rate on a profit some building affiliate might gain by the transaction on account of Petitioner's failing to levy the previously discussed fees. As seen, Petitioner's profits from its building subsidiaries were derived from a dividend declared by one of its building subsidiaries, a sale of its stock in a building subsidiary or the liquidation of one of its subsidiary builders. There is no evidence that the profit, whoever benefited therefrom, would be taxable at a 50% rate.

Petitioner attempts to invoke the fair value price theory and relies on the testimony of its employees and former employees who at one time or another had served on its mortgage committee. These individuals did not know when the mortgages were sold to the subsidiary as this operation was handled by Petitioner's treasury department, but they did know that there was no test of market value made except the one conducted at the inception of the participation project. Petitioner contends that the Tax Court erroneously disregarded the uncontradicted, unimpeached, and competent testimony of its expert witnesses that Petitioner received not less than fair market value for the mortgages sold. It is noteworthy that one of Petitioner's witnesses testified that the market was so erratic from 1948 to 1954 it could have been above par one month and below par the next. Another of Petitioner's

expert witnesses testified that in addition to its own source of determining market value, FNMA disseminated monthly listings of the various classifications of mortgages showing their going rate in their respective states. This witness, however, could not recall if the FNMA quotations varied from the information provided by Petitioner's branch offices at the time the mortgages were originated on a particular project. Nor is there any evidence that at the time of the subsequent sale of the mortgages the prices received compared favorably in value to FNMA's going rates.

Moreover, these expert witnesses' testimony with respect to the history of the mortgage market was not generally in accord. One witness testified that the market varied depending upon the geographical locality prior to the market's "falling out of bed" sometime in 1953. Another one of the experts testified on direct examination that starting around 1951 or 1952 mortgages sold at a discount, but on cross-examination qualified this, asserting that the market fluctuated above and below par monthly from 1948 through 1954.

The Tax Court in its findings that Petitioner failed to establish that the fair market value was less than par at the date the sales were made either rejected or discounted heavily Petitioner's expert testimony.

Petitioner's argument on this point is unconvincing because of the following contrary evidence. The Tax Court found that the mortgages involved were FHA and VA 4½%, but the evidence did not establish the fact that they were selling at a discount during the years in issue. A stipulated exhibit reflects that Petitioner sold mortgages with unpaid principal balances of some $3,500,000 in 1954 to non-affiliates, all at par. Most of them were sold to FNMA. In 1955 Petitioner sold only one 4½% mortgage to a non-affiliate at a 1% discount. On the same day, Petitioner sold seven mortgages to the same vendee at par. From this, the Tax Court concluded mortgages of this type were approximately par, and in any

event, the evidence, or lack thereof, failed to establish that the fair market value of any mortgage sold by Petitioner to its subsidiaries was less than par on the date that the sale was made.

Aside from this finding's being based on contrary evidence, it is also significant that the Tax Court was the arbiter of the witnesses' credibility in assessing the probative value of their testimony. This principle is clearly enunciated in Anderson v. Commissioner, 250 F.2d 242 (5th Cir. 1957).

This Court has been confronted itself with the question of the weight to be accorded expert testimony regarding fair market value of taxable property. In Fitts' Estate v. Commissioner, 237 F.2d 729 (8th Cir. 1956), the taxpayer, as in the case at bar, argued that because no evidence had been offered by the Commissioner to directly contradict the expert witnesses' testimony fixing the fair market value of certain stock in taxpayer's estate, such testimony should be assigned great weight. Upholding the Tax Court's evaluation of the stock at a different figure than advanced by taxpayer's experts, this Court ruled:

> "The evidence of competent impartial expert witnesses should not be arbitrarily ignored and disregarded. However, where there is substantial evidence in the record to support the court's decision, the court is not bound by the opinion of the experts." Fitts' Estate v. Commissioner, supra, 237 F.2d at 732.

Not only does this decision stand for the proposition that experts' opinions may be discounted in light of contrary evidence, but it also recognizes the role of impartiality in the weighing of such testimony. See also Midland Ford Tractor Company v. Commissioner, 277 F.2d 111 (8th Cir. 1960) wherein the court affirmed the Tax Court's finding that the compensation received by certain corporate officers was unreasonable despite the "expert testimony" of the officers in question to the contrary. Speaking for the Court, Judge Gardner found that the

Tax Court's decision was also supportable by other evidence. However, it was not bound, in his words, to believe the testimony of any witness even though not directly contradicted, as the Tax Court was the exclusive judge of credibility of the witnesses and the weight to be given to their testimony.

Similarly, in Seletos v. Commissioner, 254 F.2d 794, 797 (8th Cir. 1958) Judge Sanborn touched on the effect of self-interest on a witness' testimony:

"The evidence of interested witnesses does not have to be accepted at face value, and the extent to which such evidence may be affected by self-interest is for the trier of the facts to determine."

Petitioner's contention that its expert testimony is dispositive of the issue of fair market value pales in the light of the aforecited authorities. In short, the contrary evidence in the record, the self-interest of Petitioner's expert witnesses in the suit's outcome, coupled with their own testimony's patent lack of specificity on the question of fair market value during the years in issue, provided the Tax Court ample support for its decision which cannot be said to be clearly erroneous.

Petitioner further argues that the price at which the mortgages were sold by it to its subsidiaries was an integral part of a realistic and bona fide transaction between the parties.

Respondent contends that the domination of the subsidiaries by Petitioner was so complete the transactions lacked finality and also by reason of the transactions between Petitioner and its subsidiaries being so violative of the Investment Company Act of 1940 that to allow any of the deductions would frustrate the provisions of said Act.

We agree with Petitioner that transactions must not be disregarded simply because they are not at arm's length and that legal transactions cannot be upset merely because parties have entered into them for purposes of minimizing or avoiding taxes which might otherwise accrue. E. g., Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, (1935); Sun Properties, Inc. v. United States, 220 F.2d 171 (5th Cir. 1955).

We do not agree, however, that the transactions between the parties here were such as would be entered into by unrelated third parties. The record shows that 95% of the alleged losses in issue stemmed from the transactions between Petitioner and ISA and a little less than 5% related to sales of mortgages by Petitioner to IST&G. There is not one word of testimony in the record that would give the slightest suggestion that ISA was anything but Petitioner's alter ego. ISA had no offices of its own, no personnel of its own, Petitioner sold and serviced its face-amount certificates and Petitioner's treasury department determined what mortgages ISA would buy, when, and at what price. Petitioner's witness testified that on occasion in order to satisfy its sales to outsiders they would also include a "bundle" of mortgages of ISA. The evidence shows that despite a written contract existing during the time that certain earned premiums were received on sales of mortgages by Petitioner to ISA, Petitioner refunded without consideration during the years in question $301,382.81 of said premiums. Unrelated third parties would not deal with each other in such a fashion. An unrelated third party would not purchase a mortgage at par, substantially in excess of its fair market value without collecting the permissible fee to compensate for its loss. Neither would an unrelated third party pay more than fair market value for mortgages over a period of time, as Petitioner's witnesses testified probably occurred late in 1953 and early in 1954 in the purchase of the mortgages by ISA and IST&G from Petitioner. Petitioner's answer to this extraordinary conduct is simply that the subsidiaries had obligations to the holders of their face-amount certificates and the relationship between these certificate holders and the subsidiaries set them apart from Petitioner to an unusual degree. The

certificate holders had no voice in the control or management of the subsidiaries and occupied no different status to the subsidiary companies than do life insurance policy holders to a stock insurance company. Petitioner contends that these were regulated companies, but it is significant to note that Petitioner's annual reports to SEC all show that sales to subsidiaries were at not less than cost. It was not reported to the SEC until 1956, long after participation projects had ceased to be originated by Petitioner, that the permissible premium of 1½% was discontinued in December, 1953. Petitioner has never reported to the SEC that it put its own interpretation on its "cost" of the mortgages which it was required to sell to its subsidiaries at cost or the remaining principal balance, whichever was less. Likewise, there is no evidence in the record to indicate that it was ever reported to any interested agency, state or federal, that Petitioner refunded to its subsidiary in excess of $300,000 in fees earned under written contracts more than a year after receipt. It is these undisputed transactions between Petitioner and its subsidiaries that prompt Respondent to contend that the allowance of any of the loss deductions would frustrate the provisions of the Investment Company Act of 1940. However, this Court's finding Petitioner's losses disallowable for deficiencies in its burden of proof, renders comment on the merit of Respondent's argument superfluous.

The artificial formula guaranteed a loss for the Petitioner on each of the transactions, despite the fact that if the SEC order had been followed the least Petitioner would have obtained for these mortgages would have been its cost. The formula, devised to guarantee a loss to Petitioner, actually resulted in its subsidaries' paying an excess over the cost!

 Substance, rather than form, controls tax liability. In piercing the form of these transactions to weigh their substance, Petitioner's claimed right to deductible losses disappears.

Moreover, this Court has held:

"The burden is upon a taxpayer to establish a deductible loss or expense and the amount of it. Burnet v. Houston, 283 U.S. 223, 227, 51 S.Ct. 413, 75 L.Ed. 991; Botany [Worsted] Mills v. United States, 278 U.S. 282, 289, 290, 49 S.Ct. 129, 73 L.Ed. 379." Bennett v. Commissioner, 139 F.2d 961, 963 (8th Cir. 1944).

Petitioner's evidence did not successfully meet this burden.

*Telesyndicate Project Loans:* In addition to the mortgages originated by Petitioner through its participation projects and sold to its subsidiaries, it acquired in 1950 some conventional type mortgages known as the Telesyndicate Project Loans. These mortgages were on real estate in Washington, D. C. and at the time of acquisition Petitioner received a fee of 9½% of the unpaid principal amount of said mortgages and included this fee in its income for 1950. In December of 1954 and in 1955 Petitioner sold these mortgages to ISA and claimed a loss in each year which was disallowed.

There was no valid or competent proof of the value of these mortgages at the time of the sales to ISA. Details of these transactions were covered by Petitioner's chief accounting officer, who testified that these mortgages were sold to ISA at not less than market value. On cross-examination, however, he admitted he was not a mortgage expert and could not give an expert's opinion. He further testified that if the mortgage market deteriorated since 1950, the date of acquisition, the sale price must have been close to market value. He indicated that these particular mortgages were a peculiar and isolated deal and that he was actually testifying on the general pattern of FHA and VA loans. He concluded that this type of mortgage would have to be appraised to determine whether the sale price was above or below market value. This witness' testimony clearly indicates that his opinion was speculation based on the general condition of the market with respect to FHA and VA loans, which, of course,

**354**

bore a lower interest yield. Thus, the witness was correct in his initial conclusion that it would take an appraisal to determine the value of the mortgages at the time of the sale to ISA. Therefore, since no such appraisal was made, Petitioner has also fallen short of the burden of establishing a deductible loss as to these items for tax purposes.

■ The Supreme Court has held that appellate review of fact determination must be restricted and the conclusions of the trier of facts must stand unless clearly erroneous. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). See G. W. Van Keppel Co. v. Commissioner, 295 F.2d 767 (8th Cir. 1961) and Miller v. Commissioner, 295 F.2d 538 (8th Cir. 1961) wherein the Supreme Court's standard was applied by this Circuit.

We cannot upon a review of the entire evidence hold that the Tax Court's findings were clearly erroneous. On the other hand, we find that the conclusions of the Tax Court are amply supported by the evidence.

The final issue is whether Petitioner is entitled to ordinary losses on mortgages it sold to non-affiliates in 1955 rather than capital losses. In its income tax return for the year 1955 Petitioner shows that it sold five hundred twenty-six mortgages to non-affiliates at a capital loss. In its petition to the Tax Court, Petitioner alleged that this loss should have been taken as an ordinary loss and claimed a refund.

One of Petitioner's witnesses testified that some mortgages were originated by Petitioner for its own account as it still had face-amount certificates outstanding, the holders thereof were making periodic payments on them, and that Petitioner was required to invest this source of revenue in mortgages and other securities as a reserve to secure the certificates. Most of the mortgages originated or acquired by the Petitioner were for resale to its subsidiaries or others. Thus, it is seen that under the obligation of Petitioner to its certificate holders it acquired mortgages as a capital asset for its reserve account and also acquired mortgages for resale. Therefore, Petitioner in order to be entitled to an ordinary loss had the burden of proving that these mortgages were not acquired for investment account, but rather were acquired for sale to its customers in the regular course of business.

■ This Court has held that property sold and held for sale to customers in ordinary course of trade is a question of fact. Rider v. Commissioner, 200 F.2d 524 (8th Cir. 1952).

Petitioner cited a number of cases in support of its argument but all are inapposite and non-analogous to the instant case because none deals with a taxpayer required to hold a capital assets reserve for issued, face-amount certificates—the same type of property it was selling to others in the regular course of business. Petitioner was required under contracts with certificate holders to acquire some mortgages for investment and failed to show that the sale of the mortgages to non-affiliates did not come out of that investment or capital account. Petitioner cites the case of Burbank Liquidating Corporation, 39 T.C. 999 as being in conflict for the reason that the Tax Court held that the loss upon the sale of loans was deductible as an ordinary loss by a savings and loan association because such a company could properly be described as rendering a service for making the loans and, therefore, said loans were exempt under § 1221(4) of the Internal Revenue Code of 1954 which excludes from capital assets "accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property * * *."

The distinction in that case should be obvious by reason of the fact that Petitioner here received mortgages not only for its investment account but also for its ordinary course of trade or business. Certainly the mortgages it acquired for its investment account were not "acquired in the ordinary course of trade or business for services rendered".

Petitioner has simply failed to prove whether the mortgages sold to non-affiliates were from its investment account or inventory account, and thereby failed to sustain the burden of proof required to establish these losses as ordinary rather than capital.

A careful study of the record in the light of applicable authorities does not persuade us that any findings were erroneously reached. Therefore, the decision of the Tax Court is

Affirmed.