Ardela, Inc., et al. v. Commissioner.[1]
Ardela, Inc. v. Commissioner
Docket Nos. 5629-67, 5630-67, 5633-67, 5634-67.
United States Tax Court
T.C. Memo 1969-83; 1969 Tax Ct. Memo LEXIS 213; 28 T.C.M. (CCH) 470; T.C.M. (RIA) 69083; April 23, 1969, Filed *213 David A. Katz, 935 Nat'l Bank Bldg., Toledo, Ohio, for the petitioners. Harvey N. Shapiro, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Dkt. No.
Taxable year ending
Deficiency
5629-67
October 31, 1960
$ 290.53
October 31, 1961
288.52
October 31, 1962
415.48
October 31, 1963
201.83
5630-67
June 30, 1963
2,970.47
June 30, 1964
5,261.87
5633-67
July 31, 1961
874.17
July 31, 1962
355.33
July 31, 1963
223.96
5634-67
June 30, 1960
4,049.85
June 30, 1961
4,223.58
June 30, 1962
2,696.06
June 30, 1963
2,882.25
June 30, 1964
3,536.14 The sole issues herein are the character and extent of losses claimed to have been sustained by each petitioner in their fiscal years ending in 1963, with respect to indebtedness owed to each of them by Rush Stamping Company. Other years are involved solely because of loss carryovers and carrybacks deriving from this item. Findings of Fact Some of the facts have been stipulated and are found accordingly. The Sycamore Realty Company, Rutland Corporation, and Ardela, Inc. (hereinafter "Sycamore," "Rutland," and "Ardela," respectively) are now and during all relevant periods *214 have been Ohio corporations with their principal place of business at Toledo, Ohio. Pivot, Inc. (hereinafter "Pivot") is a dissolved Ohio corporation which, prior to the filing of a certificate of dissolution on December 28, 1963, had its principal place of business at Toledo, Ohio. Each of the foregoing corporations filed its income tax returns for the years in question with the district director of internal revenue, Cleveland, Ohio. All four petitioners were investment companies and none was in the business of lending money during the taxable years in question. At all times relevant herein, all of the outstanding stock of Ardela, Sycamore, and Rutland and fifty percent of the stock of Pivot was owned individually by, or in trust for, Herman Wiener, his son, Martin Z. 471 Wiener, and members of their families. The other fifty percent of the Pivot stock was owned in trust for the children of Eliot M. Meisel. Rush Stamping Corporation (hereinafter "Rush") was an Ohio corporation which operated a stamping plant in Toledo, Ohio. In March 1961, Sycamore owned two-thirds and Eliot M. Meisel one-third of its outstanding stock. In early 1961, Rush closed down its Toledo operations. Thereafter, *215 in March 1961, pursuant to a written agreement between Rush and Del T. Kay and Virgil L. Shoemaker (hereinafter "Kay and Shoemaker"), to which Sycamore, Martin Z. Wiener, Eliot Meisel, and Herman Wiener were also parties, Rush acquired the assets (including goodwill, but not including cash or accounts receivable) of SKS Die Casting Company, a partnership located in Berkeley, California. The total purchase price was $785,000, subject to certain contingent adjustments not relevant herein, payable as follows: $10,000 upon execution of the agreement, $140,000 on March 7, 1961, and the balance in quarterly installments of $15,875, with interest of 8 percent per annum on the unpaid balance. The agreement committed Sycamore, Martin Z. Wiener, Eliot Meisel, and Herman Wiener to "advance or cause to be advanced [to buyer] such funds as are reasonably necessary for the operation" of the business thus acquired not to exceed $200,000 at any one time, as well as the $150,000 needed for the initial payment to Kay and Shoemaker. The $150,000 of advances was to be subordinated to the obligation to Kay and Shoemaker and the claims of general creditors. The agreement provided for chattel mortgages *216 on Rush's existing and after-acquired equipment and machinery to secure the indebtedness to Kay and Shoemaker. In addition, the stock of Rush was to be pledged to Kay and Shoemaker as security for the performance of the agreement by Rush. Sycamore loaned Rush $200,000 on March 2, 1961, $50,000 on December 15, 1961, and $50,000 in March of 1962. In January 1963, Sycamore credited the $200,000 loan with a $12,000 payment on account. On January 28, 1963, the unpaid principal balance on each loan was $188,000, $50,000, and $50,000, respectively. On August 3, 1962, Rutland loaned Rush $150,000. As part consideration, Rutland was granted an option to purchase a 25 percent equity interest in Rush for $1.00. On January 31, 1963, the unpaid principal balance due on the loan was $146,022.15. On June 12, 1962, Pivot loaned Rush $10,000. On January 31, 1963, the entire principal of this loan was outstanding. In addition, Rush owed Pivot $29,374.61 for advances on open account. With the exception of the open account advances by Pivot, all of the foregoing loans were specifically authorized by the board of directors of the respective corporations and each loan was evidenced by an unsecured, interest-bearing, *217 negotiable promissory note. In January of 1956, Ardela sold to Benton, Inc., a newly formed Ohio corporation, certain depreciable assets. Most of the purchase price was received in the form of an interest-bearing, negotiable note secured by a chattel mortgage. On August 15, 1958, for reasons irrelevant herein, Benton, Inc., was dissolved and its assets and liabilities, including said note, were taken over by Rush. At that time the principal balance outstanding on the note was $52,000. During its fiscal year ending October 31, 1962, Ardela received $17,500 from Rush as a principal payment together with $6,733.34 in payment of accrued interest. Early in its fiscal year 1963, Rush paid an additional $1,500 on account of principal. By January 28, 1963, the principal balance outstanding on the note was $33,000. Rush's operation of the SKS Die Casting Company business was unsuccessful. By the end of 1962, it had become apparent that, unless Rush were revitalized, it would be unable to continue to meet its obligations to Kay and Shoemaker under the March 1961 purchase agreement. In the fall of that year, an unsuccessful attempt was made to obtain a Small Business Administration loan for *218 Rush. Thereafter, negotiations were commenced having as their objective the taking over of Rush by one Bruce McPhaden and Sutter Capital Company. One of the proposed documents prepared in the course of these negotiations was an agreement to compromise the indebtedness of Rush to petitioners. At or about the same time, negotiations were also begun with Kay and Shoemaker to have them take over Rush and to arrange for petitioners to recoup some part of their loans. On March 18, 1963, an agreement was concluded under which Kay and Shoemaker 472 acquired all of the Rush stock. In addition, all of the notes described above were endorsed in favor of Kay and Shoemaker and the open account owed to Pivot assigned to them, all without recourse, for $23,560.42 in cash and an interest-bearing promissory note of Kay and Shoemaker for $111,022.15. The proceeds were allocated among petitioners as follows: Sycamore notes:
$15,284.22 in cash plus a 64.9 percent interest in the Kay and Shoemaker note.
Rutland note:
$7,736.31 in cash plus a 32.85 percent interest in the note.
Ardela note:
$5.00 in cash.
Pivot note:
$529.89 in cash and a 2.25 percent interest in the note.
Pivot account receivable
$5.00 in cash.
*219 As a result of the foregoing transaction Sycamore sustained a loss of $200,662.40, Rutland sustained a loss of $101,815.07, Pivot sustained a loss of $36,341.73, and Ardela sustained a loss of $32,995.00. All these losses represented principal. The losses were charged off on the books of each petitioner at the end of each petitioner's taxable year after the closing of the transaction by which Kay and Shoemaker acquired Rush. As of March 31, 1965, the notes endorsed by petitioners to Kay and Shoemaker and the assigned account receivable in favor of Pivot were still outstanding and were carried as liabilities on Rush's books. During the year ending March 31, 1965, Rush paid Kay and Shoemaker interest on such indebtedness. On February 1, 1963, the assets, liabilities, and net worth of Rush, as reflected on its books, were as follows: * *220  10 Assets
Cash
$ 6,768.03
Accounts receivable
118,947.90
Inventories
122,322.61
Prepaid expenses 14,166.04
Current assets
$262,204.58
Fixed assets
$648,639.26
Less: accumulated de- preciation 81,521.18
567,118.08
Goodwill
250,015.50
Other assets
25,610.26
Total assets $1,104,948.42
* 10 Liabilities and Net Worth
Account payable trade
$ 35,111.47
Notes payable - current
172,262.62
Taxes payable
10,426.84
Other current liabilities 29,035.92
Current liabilities
$ 246,836.85
Notes payable - non-current 955,281.26
Total liabilities
* $1,202,118.11
Home office investment (97,169.69)
Total liabilities and home office investment $1,104,948.42
The assets, liabilities, and net worth of Rush, as reflected on its books on November 30, 1962 and December 28, 1962, were substantially the same as the foregoing. Rush's Federal income tax return showed approximately $825,000 and $1,000,000 in sales for its fiscal years ending March 31, 1962 and March 31, 1963, respectively. Ultimate Findings of Fact 1. The notes and the account receivable involved herein were capital assets in the hands of petitioners. 2. The notes and the account receivable were sold by petitioners to Kay and Shoemaker. Opinion The sole issue is the treatment of losses sustained by each petitioner during its 1963 fiscal year with respect to indebtedness [2] of Rush Stamping Corporation in its favor. Respondent contends that the losses were capital losses; petitioners contend that they were deductible in full. We agree with respondent. Petitioners *221 make three alternative arguments in support of their position: first, that the losses were deductible as bad debts because the indebtedness became totally or partially worthless prior to disposition; second, that the debts were not capital assets; and third, that there was a compromise and not a "sale or exchange" of the debts. Petitioners first claim that, irrespective of the disposition, they are entitled to a deduction for worthless bad debts under section 473 166(a). [3] The only evidence supporting the claim of worthlessness consists of various balance sheets and the testimony of petitioners' accountant and sole witness. The accountant described Rush's financial condition in general terms, stating that, in his opinion, petitioners would realize not more than $100,000 to $150,000 out of a liquidation of Rush. No other evidence was offered as to the actual, as distinct from book value, of Rush's assets. In light of the foregoing and particularly in light of the fact that Kay and Shoemaker, bargaining at arm's length, were willing to pay petitioners $134,582.57 for the indebtedness, there is no basis whatsoever for any claim of total worthlessness to support a deduction under section 166(a)(1). *222 We further hold that, on the record herein, petitioners have also failed to carry their burden of proof as to partial worthlessness prior to the transfer of the indebtedness to Kay and Shoemaker. Concededly, petitioners are not required to prove that Rush was a dead horse at the end of 1962 or early in 1963. But they must prove that its prospects were so sick and discouraging that its demise was likely to occur. To be sure, Rush was in considerable difficulty and refinancing was apparently needed. But the fact is that, during the period in question, Rush was actively carrying on business operations, seemingly at an increased level of sales. Moreover, we note that in fiscal 1962 and in fiscal 1963 *223 payments were made on account of the indebtedness in favor of Sycamore, Ardela, and Pivot and that $200,000 of the indebtedness was not subordinated to the claims of Kay and Shoemaker [4] and to those of general creditors. Thus, the fact that petitioners received less than the face amount of the indebtedness does not necessarily prove that the balance was uncollectible. Without further evidence, it simply indicates that collection may have had to be delayed beyond the due dates. Under these circumstances, we cannot say that the partial worthlessness of the indebtedness has been established. Cf. Bullard v. United States, 146 F. 2d 386, 388 (C.A. 2, 1944); Walter H. Goodrich & Co., 40 B.T.A. 960, 963 (1939); C. P. Mayer, 16 B.T.A. 1239, 1241 (1929). Compare Charles W. Steadman, 50 T.C. 369 (1968), on appeal (C.A. 6, Jan. 3, 1969). This is particularly the case in light of the facts that the Secretary of the Treasury or his delegate must be satisfied that the indebtedness has become partially worthless and that his determination is dispositive of the issue in the absence of an abuse of discretion. Section 166(a)(2); section 1.166-3 (a)(2)(i) and (iii); Dodd v. Commissioner, 298 F. 2d 570, 579 *224 (C.A. 4, 1962), affirming a Memorandum Opinion of this Court; Giles E. Bullock, 26 T.C. 276, 299 (1956), affirmed per curiam 253 F. 2d 715 (C.A. 2, 1958); 5 Mertens, Law of Federal Income Taxation (Zimet and Weiss Rev.), sec. 3017.
Even if we could find that the indebtedness became partially worthless, petitioners would still not be entitled to a deduction under section 166(a)(2). It has long been established that where an indebtedness is disposed of, it is necessary that the chargeoff be made before the disposition. Von Hoffmann Corp. v. Commissioner, 253 F. 2d 828 (C.A. 8, 1958), affirming a Memorandum Opinion of this Court; Mitchell v. Commissioner, 187 F. 2d 706 (C.A. 2, 1951), reversing and remanding 13 T.C. 368 (1949); Maurice Levy, 46 B.T.A. 423 (1942), affd. 131 F. 2d 544 (C.A. 2, 1942); see J. E. Hawes Corp., 44 T.C. 705, 708 (1965); Mac Levine, 31 T.C. 1121, 1125 (1959). *225 Here the charge-off of the account and of each note did not take place until the end of each petitioner's taxable year, well after the transfer to Kay and Shoemaker. Petitioners seek to avoid the impact of these cases by arguing that in late 1962 they were aware of the partial worthlessness of the Rush indebtedness and that their negotiation of a partial recovery was in itself a manifestation of their abandonment of any hope of recovering the full amount owed. 474 In addition, they argue that certain of the recitals in the agreement of March 1963 are objective evidence of this abandonment. Petitioners' arguments simply do not pass muster. There is absolutely no basis, apart from the transfer of the indebtedness to Kay and Shoemaker, for the assertion that petitioners manifested any claim of partial worthlessness prior thereto. To say that the transfer itself satisfied the statute would emasculate the requirement of charge-off prior to disposition. Moreover, we note in passing that the alleged subjective views of petitioners were based upon the determination of their accountant, who had complete access to their books and records and who presumably could have made or caused to have made *226 the necessary entries reflecting timely charge-offs. It is entirely likely that petitioners did not take any steps to charge off a part of the Rush indebtedness because of a concern that such action would prejudice their ability to maximize their recoupment in the negotiations with Kay and Shoemaker for the transfer of the Rush business. Commissioner v. MacDonald Eng. Co., 102 F. 2d 942 (C.A. 7, 1939), affirming 35 B.T.A. 3 (1936), relied upon by petitioners, involved an intercompany transfer of a totally worthless debt without consideration and is clearly distinguishable. Petitioners' second argument is that the debts were not capital assets in their hands and that therefore the exclusion of section 1221(4) applies. [5] *228 Clearly, section 1221(4) does not apply to all notes and accounts receivable: it applies only to those "acquired in the ordinary course of trade or business." (Emphasis supplied.) Petitioners allege on brief that they were in the business of making loans. But they have provided no probative evidence to support their allegation. In point of fact, the stipulation of facts simply recites that each of the petitioners was an "investment company." There is no evidence that *227 any of the petitioners made a business of lending money in the sense of a continuous, regular course of behavior. Formal approval of the appropriate board of directors was secured for all of the indebtedness herein represented by notes, except possibly Ardela's, a course of conduct inconsistent with the idea that lending money was in the ordinary course of petitioners' business.[6] In light of the foregoing, Burbank Liquidating Corporation, 39 T.C. 999 (1963), modified on other grounds 335 F. 2d 125 (C.A. 9, 1964), relied upon by petitioners, is clearly inapplicable. In that case, the taxpayer was a savings and loan institution and lending money quite obviously was the ordinary course of its business. Cf. Investors Diversified Services, Inc. v. Commissioner, 325 F. 2d 341, 354 (C.A. 8, 1963), affirming 39 T.C. 294, 315 (1962). Moreover, the legislative history clearly indicates that section 1221(4) was directed to an entirely different problem than that involved herein. Thus, the Report of the Ways and Means Committee of the House of Representatives at the time of its enactment states: Under present law a taxpayer is now required to take into income the value of an account or note receivable acquired in the sale of inventory or stock in trade, or in connection with the rendering of services. Unless the taxpayer is a dealer in accounts and notes, however, *229 he receives only a capital loss if he sells the account or note for less than he previously took into income. Since this in effect is a business bad debt, ordinary loss treatment appears appropriate. See also id. at pp. A273-A274 and S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 111, 431 (1954). When petitioners made the loans of money involved herein, they took nothing into income. [7] Quite plainly, therefore, they 475 do not fit within either the language or the legislative rationale for section 1221(4). Petitioners also point out that the exceptions to capital treatment should be broadly construed, citing Corn Products Co. v. Commissioner, 350 U.S. 46 (1955). Granted that a "flexible approach" may be desirable when dealing with the often elusive concept of capital assets (see Booth Newspapers, Inc. v. United States, 303 F. 2d 916, 920 (Ct. Cl. 1962)), it is obvious that, on the record before us, their losses cannot be considered to have occurred in the day-to-day operation of a business. Consequently, we are unable to conclude that the factual situation herein falls within the ambit of Corn Products, Booth Newspapers, *230 Inc., or comparable cases. Petitioners' argument that, because the loans were debt rather than equity (see footnote 2, supra) they were therefore not "investment" and hence should not be held to be capital assets is based on a confusion between the term "capital" as used by accountants and "capital asset" as used in tax law. It is clear beyond dispute that a "straight loan," as petitioners characterize it, may be a capital asset. See, e.g., Estate of Clarence E. Lehr, 18 T.C. 373 (1952). We hold that the notes and the open account involved herein were capital assets in petitioners' hands. According to petitioners' third and final argument, the substance of the transaction was a compromise of the indebtedness with Rush, rather than a sale of the indebtedness to Kay and Shoemaker. Therefore, according to petitioners, there was no "sale or exchange" of the indebtedness, and, hence, the limitations of section 1211(a) do not apply. [8]
Petitioners do not deny that the transaction was cast in the form *231 of a sale. But they argue that they intended to "compromise" the indebtedness, that Kay and Shoemaker were, for practical purposes, the owners of Rush, and that therefore the latter merely acted as Rush's alter ego in purchasing the indebtedness. If Kay and Shoemaker had forthwith caused Rush to retire the indebtedness there might have been some substance to petitioners' contention. But they did not; the indebtedness was still outstanding two years later, and for all that appears in the record, may be outstanding even now. This fact sharply distinguishes George A. Adam, a Memorandum Opinion of this Court dated June 28, 1944, heavily relied upon by petitioners. In that case, when all the transactions were completed, the debtor corporation actually had retired its indebtedness. This Court merely applied the so-called "step transaction" doctrine to find that there was, in substance, a compromise. Clearly, in this case, Rush was an entity legally distinct from the owners of its shares. While Kay and Shoemaker might have acted as its agents, it appears that in fact they did not. They acquired legal title to the indebtedness for consideration paid, and held it as a claim against Rush for *232 at least two years and perhaps longer. Indeed, there may have been good reason for structuring the agreement so as to enable Kay and Shoemaker to claim the full amount of the notes and open account as debts owing to them by Rush. See R. M. Edwards, 50 T.C. 220 (1968), on appeal (C.A. 10, July 15, 1968). Moreover, the fact that the negotiations with Sutter Capital Company contemplated a compromise of the indebtedness has little, if any, probative force as to the intentions of the parties in the transaction that was actually consummated. Not only were the parties different, but the considerations where a corporate purchaser is involved could dictate against a purchase and in favor of a direct settlement with the debtor. Compare section 243(a)(1) with section 1232(a)(1). We hold, as our findings of fact reflect, that, in substance as well as in form, the transfer of the indebtedness to Kay and Shoemaker constituted a sale. Consequently, the limitations of sections 165(f) and 1211 (a) apply. Decisions will be entered for the respondent. 476 Footnotes
1. Cases of the following petitioners are consolidated herewith: Sycamore Realty Company, Docket No. 5630-67; Pivot, Inc., Docket No. 5633-67; and Rutland Corporation, Docket No. 5634-67.↩
*. The indebtedness to Ardela and to Pivot. aggregating $72,374.61 in principal amount, and debentures of approximately $6,800 held by Eliot M. Meisel represented additional liabilities not reflected in this figure.
2. Respondent has not challenged the status of the debts as "bona fide" indebtedness. See section 1.166-1(c), Income Tax Regs.↩
3. All statutory references, unless otherwise indicated, are to the Internal Revenue Code of 1954. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
4. Since the March 1961 agreement provided for chattel mortgages in favor of Kay and Shoemaker on Rush's machinery and equipment, the $200,000 would effectively come behind any claims of Kay and Shoemaker as to any machinery and equipment in fact so secured, but not with respect to other unsecured assets, e.g., inventory.↩
5. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * * (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1). * * * ↩
6. Ardela's note derived from the sale of depreciable assets ("furniture and equipment"), not from the lending of money. Petitioners have not even suggested that Ardela sold such assets in the ordinary course of its business, so as to bring the property sold within the scope of section 1221(1), and thereby bring the note within the scope of section 1221(4)↩.
7. No question of interest accrued but unpaid is involved herein.↩
8. Neither party has raised any question as to the possible impact of section 1232(a) upon this argument so far as the notes are concerned. Cf. also McClain v. Commissioner, 311 U.S. 527↩ (1941).